UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

MICHAL HONICKMAN FOR THE ESTATE OF          :
HOWARD GOLDSTEIN, MICHAL HONICKMAN,         :
EUGENE GOLDSTEIN, LORRAINE GOLDSTEIN,       :
RICHARD GOLDSTEIN, BARBARA GOLDSTEIN        :      **COMPLAINT**
INGARDIA, MICHAEL GOLDSTEIN, CHANA          :      **JURY TRIAL DEMANDED**
FREEDMAN, DAVID GOLDSTEIN, MOSES            :
STRAUSS, PHILIP STRAUSS, BLUMA STRAUSS,     :
AHRON STRAUSS, ROISIE ENGELMAN, JOSEPH      :      **19-cv-8**
STRAUSS, TZVI WEISS, LEIB WEISS, LEIB WEISS :
FOR THE ESTATE OF MALKA WEISS, YITZCHAK     :
WEISS, YERUCHAIM WEISS, ESTHER DEUTSCH,     :
MATANYA NATHANSEN, CHANA NATHANSEN,         :
MATANYA NATHANSEN AND CHANA                 :
NATHANSEN FOR THE ESTATE OF TEHILLA         :
NATHANSEN, YEHUDIT NATHANSEN, S.N., A       :
MINOR, HEZEKIEL TOPOROWITCH, PEARL B.       :
TOPOROWITCH, YEHUDA TOPOROWITCH,            :
DAVID TOPOROWITCH, SHAINA CHAVA NADEL,      :
BLUMY ROM, RIVKA POLLACK, RACHEL            :
POTOLSKI, OVADIA TOPOROWITCH, TEHILLA       :
GREINIMAN, YISRAEL TOPOROWITCH,             :
YITZCHAK TOPOROWITCH, HARRY LEONARD         :
BEER, HARRY LEONARD BEER AS EXECUTOR OF     :
THE ESTATE OF ALAN BEER, HARRY LEONARD      :
BEER AS EXECUTOR OF THE ESTATE OF ANNA      :
BEER, PHYLLIS MAISEL, ESTELLE CAROLL,       :
SARRI ANNE SINGER, JUDITH SINGER, ERIC M.   :
SINGER, ROBERT SINGER, JULIE AVERBACH FOR   :
THE ESTATE OF STEVEN AVERBACH, JULIE        :
AVERBACH, TAMIR AVERBACH, DEVIR             :
AVERBACH, SEAN AVERBACH, ADAM               :
AVERBACH, MAIDA AVERBACH FOR THE            :
ESTATE OF DAVID AVERBACH, MAIDA             :
AVERBACH, MICHAEL AVERBACH, EILEEN          :
SAPADIN, DANIEL ROZENSTEIN, JULIA           :
ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN,     :
ESTHER ROZENSTEIN, JACOB STEINMETZ,         :
DEBORAH STEINMETZ, JACOB STEINMETZ AND      :
DEBORAH STEINMETZ FOR THE ESTATE OF         :
AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT     :
MAYERSON, NETANEL STEINMETZ, ANN            :
COULTER FOR THE ESTATE OF ROBERT L.         :
COULTER, SR., DIANNE COULTER MILLER,        :

ROBERT L. COULTER, JR., DIANNE COULTER                   :
MILLER AND ROBERT L. COULTER, JR. FOR THE                :
ESTATE OF JANIS RUTH COULTER, LARRY                      :
CARTER AS THE ADMINISTRATOR OF THE                       :
ESTATE OF DIANE LESLIE CARTER, LARRY                     :
CARTER, SHAUN CHOFFEL, RICHARD                           :
BLUTSTEIN AND KATHERINE BAKER FOR THE                    :
ESTATE OF BENJAMIN BLUTSTEIN, RICHARD                    :
BLUTSTEIN, KATHERINE BAKER, REBEKAH                      :
BLUTSTEIN, NEVENKA GRITZ FOR THE ESTATE                  :
OF DAVID GRITZ, NEVENKA GRITZ, NEVENKA                   :
GRITZ FOR THE ESTATE OF NORMAN GRITZ,                    :
JACQUELINE CHAMBERS AND LEVANA COHEN                     :
AS THE ADMINISTRATORS OF THE ESTATE OF                   :
ESTHER BABLAR, JACQUELINE CHAMBERS,                      :
LEVANA COHEN, ELI COHEN, SARAH ELYAKIM,                  :
JOSEPH COHEN, GRETA GELLER, ILANA                        :
DORFMAN, REPHAEL KITSIS AND TOVA                         :
GUTTMAN AS THE ADMINISTRATORS OF THE                     :
ESTATE OF HANNAH ROGEN, TEMIMA SPETNER,                  :
JASON KIRSCHENBAUM, ISABELLE                             :
KIRSCHENBAUM, ISABELLE KIRSCHENBAUM                      :
FOR THE ESTATE OF MARTIN KIRSCHENBAUM,                   :
JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT,                   :
DAVID KIRSCHENBAUM, DANIELLE                             :
TEITELBAUM, NETANEL MILLER, CHAYA                        :
MILLER, ARIE MILLER, AHARON MILLER, SHANI                :
MILLER, ADIYA MILLER, ALTEA STEINHERZ,                   :
JONATHAN STEINHERZ, TEMIMA STEINHERZ,                    :
JOSEPH GINZBERG, PETER STEINHERZ, LAUREL                 :
STEINHERZ, GILA ALUF, YITZHAK ZAHAVY,                    :
JULIE ZAHAVY, TZVEE ZAHAVY and BERNICE                   :
ZAHAVY,                                                  :
                                                         :
                    Plaintiffs,                          :
                                                         :
         -against-                                       :
                                                         :
                                                         :
BLOM BANK SAL,                                           :
                                                         :
                                                         :
                    Defendant.                           :
--------------------------------------------------------------------x

Plaintiffs Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, Eugene Goldstein, Lorraine Goldstein, Richard Goldstein, Barbara Goldstein Ingardia, Michael Goldstein, Chana Freedman, David Goldstein, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Tzvi Weiss, Leib Weiss, Leib Weiss for the Estate of Malka Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Matanya Nathansen, Chana Nathansen, Matanya Nathansen and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, S.N., a minor, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Pollack, Rachel Potolski, Ovadia Toporowitch, Tehilla Greiniman, Yisrael Toporowitch, Yitzchak Toporowitch, Harry Leonard Beer, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer as Executor of the Estate of Anna Beer, Phyllis Maisel, Estelle Caroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Netanel Steinmetz, Ann Coulter for the Estate of Robert L. Coulter, Sr., Dianne Coulter Miller, Robert L. Coulter, Jr., Dianne Coulter Miller and Robert L. Coulter, Jr. for the Estate of Janis Ruth Coulter, Larry Carter as the Administrator of the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Nevenka Gritz for the Estate of Norman Gritz, Jacqueline Chambers and Levana Cohen as the Administrators of the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Joseph Cohen, Greta Geller, Ilana Dorfman, Rephael Kitsis and Tova Guttman as the Administrators of the Estate of Hannah Rogen, Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Arie Miller, Aharon Miller, Shani Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz, Gila Aluf, Yitzhak Zahavy, Julie Zahavy, Tzvee Zahavy and Bernice Zahavy, by their attorneys, allege the following:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the unlawful conduct of BLOM BANK (previously known as "Banque du Liban et D'Outre Mer") – a Lebanese bank headquartered in Beirut, Lebanon. BLOM BANK aided and abetted the Islamic Resistance Movement ("HAMAS"), a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) by knowingly providing substantial assistance to HAMAS in violation of 18 U.S.C. § 2333(d) of the

Anti-Terrorism Act ("ATA"), and is civilly liable under § 2333(d) of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism perpetrated by HAMAS.

2.      BLOM BANK knowingly – and with awareness of its important role – provided financial services to HAMAS in several related ways set forth below, by maintaining accounts for, and facilitating substantial payments on behalf of, HAMAS's Lebanese institutions, most notably the Sanabil Association for Relief and Development ("Sanabil"), which was designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist ("SDGT") in 2003.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a), 2333(d), and 2338.

4.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b).

5.      BLOM BANK is subject to personal jurisdiction in New York pursuant to 18 U.S.C. § 2334(a), N.Y. CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business during the relevant period and committed tortious acts within the United States during the relevant period by transferring funds through the United States for the benefit of HAMAS.

6.      As set forth below, BLOM BANK purposefully used its multiple correspondent bank accounts at U.S. financial institutions, including its accounts at Bank of New York, Citibank NA and American Express Bank Ltd. in New York to provide financial services to HAMAS, including facilitating the transfer of millions of U.S. dollars through the United States on

HAMAS's behalf or for HAMAS's benefit.

## THE PARTIES

**A.      The Plaintiffs**

7.      The Second Intifada ("al-Quds" or "al-Aqsa Intifada"), which broke out in Israel and the Palestinian Territories in September 2000, was a key turning point in HAMAS's history.

8.      In the initial weeks of the Second Intifada, large demonstrations were organized in several Palestinian cities. On October 12, 2000, a Palestinian mob in Ramallah attacked two off-duty Israeli reservists, lynched them, and celebrated their deaths – with much of the scene captured on camera.

9.      Soon thereafter, HAMAS, Palestinian Islamic Jihad ("PIJ"), the Popular Front for the Liberation of Palestine ("PFLP") and the Palestinian Authority's ruling faction, Fatah, all launched attacks on Israeli civilian centers, military installations, vehicles, and civilians through suicide bombings, drive-by shootings, and rocket launchings, which resulted in the death and injury of hundreds of individuals, including numerous American citizens.

10.      From September 2000 forward, support by the Palestinian public for HAMAS grew steadily.

11.      It won elections at Palestinian universities, trade unions, and later in municipal elections.

12.      For approximately the next four years after the outbreak of the violent conflict, HAMAS launched hundreds of terrorist attacks targeting civilians that have resulted in the deaths and injury of hundreds of civilians, including numerous American citizens.

## THE SHOOTING ATTACK ON ROUTE #60 – JUNE 20, 2003

13.      On June 20, 2003, Ahmad Najjar and Farah Hamad, two HAMAS terrorists,

perpetrated a shooting attack on Route #60 near the Yabroud underpass, killing one person and seriously injuring three others.

**The Goldstein Family**

14.     Howard Goldstein was a citizen of the United States and a resident of the State of Israel when he died.

15.     He was murdered on June 20, 2003, while driving his car with his parents on Route #60 in Israel.

16.     Howard was driving his parents and his wife from Eli to Jerusalem where they had stayed the previous night following the wedding of Howard's son, plaintiff David Goldstein. Howard and his wife and parents were traveling for a weekend in Jerusalem to further celebrate David's wedding (which had taken place the previous night).

17.     While Howard was driving, Howard's father, plaintiff Eugene Goldstein, was seated in the front passenger seat and Howard's mother, plaintiff Lorraine Goldstein, was seated behind her husband. Howard's wife, plaintiff Michal Goldstein (now Michal Honickman), was seated in the rear seat of the car, on the driver's side, behind Howard.

18.     At some point, as Howard was driving, Eugene noticed two individuals on the side of the road near the Yabroud underpass. As the Goldsteins' car approached, the men turned and began rapidly firing their guns at the Goldsteins' vehicle.

19.     Howard was struck by at least one bullet and ultimately succumbed to his injuries while driving and slumped over the steering wheel.

20.     At some point in time, while Howard was slumped over the steering wheel, Eugene grabbed the steering wheel and maintained control of the car until it crashed and rolled over, approximately eight miles south of where the HAMAS gunmen had opened fire.

21.     Plaintiff Michal Honickman, formerly known as Mindy Goldstein, is a citizen of the United States and a resident of the State of Nevada. She is the widow of Howard Goldstein.

22.     Plaintiff Michal Honickman brings this action both individually and as the legal representative of the Estate of Howard Goldstein.

23.     As a result of the attack, Michal was injured when glass fragments from the vehicle's windows struck her body, including her left eye. She also sustained hairline fractures of her ribs, bruising, and physical trauma when the vehicle eventually crashed and rolled over.

24.     Michal has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress having been present during the attack, and witnessed the death of her husband, whom she had to bury and mourn with her children, while her in-laws were hospitalized, all in the context of what had been, prior to that point, a joyous family occasion celebrating her son David's wedding.

25.     As a result of Howard's death, plaintiff Michal Honickman experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

26.     Plaintiff Eugene Goldstein is a citizen of the United States and a resident of the State of Florida. He is the father of Howard Goldstein.

27.     Plaintiff Lorraine Goldstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Howard Goldstein.

28.     Eugene suffered multiple gunshot wounds in the attack.

29.     His shoulder blade was fractured, and his lungs were punctured. Shrapnel was lodged in his lung, liver and kidneys. A bullet remains stuck between his heart and his lungs.

30.     These injuries, which caused Eugene immense pain, were life threatening. Indeed,

it was highly improbable that Eugene would survive them.

31.     Eugene's injuries necessitated insertion of a trocar, a metal cylinder used to drain blood from his chest and facilitate insertion of a chest tube to maintain suction and permit healing of the lung. Insertions of a trocar and chest tube are extremely painful.

32.     Eugene was unable to see Lorraine for approximately five days after the attack and did not have specific information about her condition. His uncertainty about Lorraine's condition caused him immense anxiety.

33.     As a result of the attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three months to monitor their condition.

34.     As a result of the attack, Eugene has difficulty falling and remaining asleep. He constantly replays the image of the attack in his mind.

35.     He blames himself for taking his wife to attend his grandson's wedding.

36.     Lorraine was shot multiple times and severely injured in the attack.

37.     She suffered a bullet fragment injury from a bullet that clipped the tip of her nose and her left upper lip and lodged in her mouth. The fragment necessitated intubation and emergency surgery, during which the fragment was removed from an area less than an inch from the carotid sheath, which contains the carotid artery and the internal jugular vein. Disruption of either of them would have resulted in her death.

38.     At one point during her hospital stay, Lorraine was placed on life support.

39.     Lorraine's chewing muscles were severely and permanently damaged, and she could not eat solid food for approximately one year.

40.     She required physiotherapy that encompassed use of a ratchet-like device designed to force her jaws open. It was very painful.

41.     Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from fully opening it. She still suffers from pain and headaches.

42.     She requires bridges (partials) because she lost her teeth as a result of the attack, and extensive periodontal and dental work.

43.     She was also struck by bullets that entered her body through her left shoulder and right lower neck. The resulting wounds caused her excruciating pain at the time.

44.     She must also deal with the harmful effects of shrapnel that lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations.

45.     Lorraine had difficulty sleeping because she thought about Howard's death.

46.     Eugene and Lorraine remained in Jerusalem at Hadassah Hospital for approximately 10 days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

47.     As a result of the attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

48.     As a result of Howard's death, plaintiffs Eugene Goldstein and Lorraine Goldstein have experienced emotional pain and suffering, loss of their son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

49.     The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

50.     The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene and Lorraine being pulled from the wreckage of the car Howard had been driving.

51.     Lorraine's face and hair were covered with blood.

52.     Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

53.     After learning of the attack, plaintiff Richard Goldstein telephoned his sister, plaintiff Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

54.     As a result of the attack, plaintiff Richard Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

55.     As a result of Howard's death, Richard Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

56.     Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene Goldstein and Lorraine Goldstein and the sister of Howard Goldstein.

57.     Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

58.     In addition to grappling with the devastating emotional consequences of her

brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

59.     Barbara blames herself for encouraging her parents to attend the wedding.

60.     As a result of the attack, plaintiff Barbara Goldstein Ingardia has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of her parents.

61.     As a result of Howard's death, Barbara Goldstein Ingardia has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

62.     Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

63.     As a result of the attack, plaintiff Michael Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

64.     As a result of Howard's death, Michael Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

65.     Plaintiff Chana Freedman is a citizen of the United States and a resident of the State of New York. She is the daughter of Howard Goldstein and plaintiff Michal Goldstein.

66.     Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

67.     Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

68.     When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

69.     Chana informed her brother, David and his wife, who had just been married, of the attack when they arrived at the hospital.

70.     As a result of Howard's death, plaintiff Chana Freedman has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

71.     Plaintiff David Goldstein is a citizen of the United States and a resident of the State of Israel. He is the son of Howard Goldstein and plaintiff Michal Goldstein.

72.     At the time of the attack, David was at a Jerusalem hotel awaiting his family's arrival for weekend wedding celebrations when he was notified that something had happened to his parents and his grandparents, and that they had been taken to Hadassah Hospital.

73.     Upon his arrival at the hospital, David learned that his father had been killed in the attack, and that his mother and grandparents had been injured.

74.     Prior to the attack, David frequently spoke to his father, including on the morning of his father's death.

75.     As a result of Howard's death, plaintiff David Goldstein has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**THE JERUSALEM EGGED BUS #2 BOMBING – AUGUST 19, 2003**

76.     On August 19, 2003, Ra'ed Abdul Hamid Misk, a HAMAS suicide bomber,

detonated explosives on Egged Bus #2.

77.     Twenty-three people were killed and over 130 others were injured in the attack.

**The Strauss Family**

78.     Plaintiff Moses Strauss is a citizen of the United States and a resident of the State of New Jersey.

79.     Moses was studying in Israel in 2003 and was planning to return to the United States in April 2004.

80.     At around 9:00 pm on August 19, 2003, he boarded Egged Bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

81.     Approximately 15 minutes into the bus ride, Moses heard a deafening boom when Misk detonated the explosives on the bus.

82.     Moses fell forward as a result of the explosion. His eyeglasses, jacket, hat and cell phone flew off his body.

83.     As Moses regained his bearings and realized what had occurred, he witnessed people screaming and crying, and he saw blood and body parts all around him.

84.     His clothes were covered with blood, and his hearing was severely impaired.

85.     To exit the bus, Moses stepped over bodies, and in a state of shock made his way toward his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Moses's father, plaintiff Philip Strauss, to tell him Moses had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

86.     As a result of the explosion, Moses's body ached, especially his right ear and hand. After arriving at the hospital, he underwent numerous tests, and doctors removed the shrapnel from

his ear and hand.

87.     Days after the attack, Moses still experienced agonizing pain in his ear, and his hearing loss did not improve.

88.     After the attack, Moses returned to the United States without completing his studies in Israel.

89.     Moses was examined by medical specialists in both Israel and the United States. Both physicians confirmed that he would require surgery on his ear.

90.     In the winter of 2004, Moses underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An ear specialist continues to monitor his condition.

91.     Moses continues to relive the attack, the images of the attack replaying in his mind daily.

92.     As a result of the attack, plaintiff Moses Strauss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

93.     Plaintiff Philip Strauss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Moses Strauss.

94.     Plaintiff Bluma Strauss is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Moses Strauss.

95.     After hearing of the attack, Bluma attempted unsuccessfully to reach Moses on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Bluma grew increasingly concerned.

96.     Upon learning that her son was injured in the bombing, Bluma's distress grew.

97.     As a result of the attack, plaintiffs Philip Strauss and Bluma Strauss have

experienced severe mental anguish and extreme emotional distress.

98.     Plaintiff Ahron Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

99.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

100.    Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact Moses on his cellular telephone but was unable to reach him. She also telephoned her other brother, Ahron, attempting to locate Moses or her parents.

101.    When Roisie finally received the news that Moses had been injured in the bus bombing, she was very concerned and extremely anxious.

102.    Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

103.    Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where Moses lived. Upon arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the plane flight, Joseph experienced great anxiety because he was uncertain if his brother had been present at the bombing.

104.    Ahron Strauss, Roisie Engelman and Joseph Strauss experienced great anxiety after learning of the attack that caused the injuries that Moses sustained.

105.    As a result of the attack, plaintiffs Ahron Strauss, Roisie Engelman and Joseph Strauss have experienced severe mental anguish and extreme emotional distress.

**The Weiss Family**

106.    Plaintiff Tzvi Weiss is a citizen of the United States and a resident of the State of New Jersey.

107.    Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

108.    On the evening of August 19, 2003, Tzvi boarded Egged Bus #2 in Jerusalem after visiting the Kotel, Judaism's holiest site, to pray. He was on his way to a friend's wedding.

109.    As the bus arrived at Shmuel Hanavi Street, he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

110.    In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

111.    Tzvi was covered with blood, and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.

112.    Once he got his bearings, Tzvi telephoned one of his brothers, plaintiff Yitzchak Weiss, and waited for him to arrive to accompany him to the hospital.

113.    An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent medical tests.

114.    Both of his eardrums had been completely torn, and his hearing in his left ear was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

115.    Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his

arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

116.     After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

117.     Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

118.     Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

119.     As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

120.     Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer realize the academic success that he had achieved prior to the attack.

121.     As a result of the attack, plaintiff Tzvi Weiss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

122.     Plaintiff Leib Weiss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Tzvi Weiss.

123.    Malka Weiss was a citizen of the United States and a resident of the State of New York when she died in 2018. She was the mother of plaintiff Tzvi Weiss.

124.    Plaintiff Leib Weiss brings this action both individually and as the legal representative of the Estate of Malka Weiss.

125.    Leib Weiss and Malka Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

126.    As a result of the attack, plaintiffs Leib Weiss and Malka Weiss (before her death) have experienced severe mental anguish and extreme emotional distress.

127.    Plaintiff Yitzchak Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

128.    Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

129.    Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

130.    Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

131.    As a result of the attack, plaintiffs Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch have experienced severe mental anguish and extreme emotional distress.

**The Nathansen/Toporowitch Family**

132.    Tehilla Nathansen was a citizen of the United States and a resident of the State of Israel when she died.

133.    Tehilla was three (3) years old and sitting on her mother's lap when she was

murdered in the suicide bomb attack on August 19, 2003.

134.    The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

135.    Plaintiff Matanya Nathansen is a citizen and resident of the State of Israel. He is the father of Tehilla Nathansen.

136.    Plaintiff Chana Nathansen is a citizen of the United States and a resident of the State of Israel. She is the mother of Tehilla Nathansen.

137.    Plaintiffs Matanya Nathansen and Chana Nathansen bring this action individually, on behalf of the Estate of Tehilla Nathansen, and on behalf of their minor daughter, S.N.

138.    As a result of the explosion, Matanya suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

139.    As a result of the attack, plaintiff Matanya Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries he sustained, from witnessing and experiencing first-hand the death of his 3-year-old daughter, Tehilla, as well as the severe injuries sustained by his wife and young daughters (all of whom are U.S. citizens).

140.    Chana was severely injured in the explosion that killed Tehilla, was taken to Hadassah Hospital, and remained there for 12 days.

141.     Although Chana repeatedly asked about Tehilla's whereabouts, she did not learn until the next day that she had been killed. That uncertainty was torture for Chana.

142.    Chana's spleen was torn, and her ribs were broken.

143.    She had seven ball bearings that caused holes in her chest, leg and arm that had to

be removed from her body.

144. She has undergone numerous surgeries.

145. Shrapnel lodged throughout her body, including her eye.

146. Chana's hip was crushed, necessitating a hip replacement. She still experiences pain in that area.

147. Her hearing is impaired, and she suffers from tinnitus.

148. Chana cannot walk long distances, and she has a limited range of movement.

149. She feels indescribable pain at losing Tehilla and seeing her daughter Yehudit injured and her daughter S.N. severely injured.

150. Chana has undergone psychological counseling.

151. As a result of the attack, plaintiff Chana Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries she sustained, from witnessing and experiencing first-hand the death of her 3-year-old daughter, Tehilla, and witnessing the severe injuries sustained by her daughters, plaintiff S.N., a minor, and plaintiff Yehudit Nathansen.

152. Plaintiff Yehudit Nathansen is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff S.N.

153. At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

154. Yehudit incurred cuts on her neck and waist from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

155. She hears constant noise in her ears, which makes her tense.

156.    Yehudit suffered nightmares, sadness and guilt and underwent psychological counseling.

157.    As a result of the attack, plaintiff Yehudit Nathansen has sustained physical injuries and experienced severe mental anguish and extreme emotional distress due to her own injuries and from witnessing and experiencing first-hand the death of her 3-year-old sister, Tehilla, as well as the severe injuries sustained by her mother, father, and baby sister.

158.    Plaintiff S.N., a minor, is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff Yehudit Nathansen.

159.    S.N. was sitting on Chana's lap at the time of the explosion. She was 5 months old at the time. As a result of the explosion, S.N. sustained burns all over her face, and her eardrums were ruptured.

160.    She suffered bilateral lung contusions and a fracture of her left femur and right leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs.

161.    S.N. also had multiple shrapnel and metal pellets lodged in her body, including in her eyes, and a laceration of the bone of her left forearm and in her left wrist. She has pain in her upper left arm.

162.    She is hearing impaired and suffers from tinnitus.

163.    She underwent psychological counseling.

164.    As a result of the attack, plaintiff S.N. has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

165.    Plaintiff Hezekial Toporowitch is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Chana Nathansen and the grandfather of the three

Nathansen girls.

166.    Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

167.    In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla, and crippled their daughter, Chana. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

168.    In the aftermath of the bombing, Chana, Matanya, and their children were transferred to different hospitals thereby complicating the family's efforts to locate them.

169.    Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body but was in too much shock to do so. He was initially told to identify the bodies of <u>two</u> granddaughters since S.N. had not yet been identified at the hospital and was thought to be deceased.

170.    As a result of the attack, plaintiff Hezekial Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

171.    As a result of the attack, plaintiff Pearl B. Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by her daughter, and injuries sustained by her granddaughters and son-in-law.

172.    Plaintiff Yehuda Toporowitch is a citizen of the United States and a resident of the

State of New Jersey. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

173.   In the middle of the night Yehuda was notified by telephone of the bombing that had killed his niece and crippled his sister.

174.   He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

175.   Yehuda rushed home, traveled with his parents to the Tel Aviv area, and stopped at the home of one of his sisters. He took a taxicab to the central morgue and attempted to identify Tehilla's remains but could not positively identify them because of the nature and extent of Tehilla's injuries.

176.   Yehuda then made arrangements for necessary DNA testing, which ultimately confirmed his niece's identity.

177.   As a result of the attack, plaintiff Yehuda Toporowitch has experienced severe mental anguish and extreme emotional distress from the death of his 3-year-old niece, Tehilla, and the attempt to identify her remains. He has also experienced severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

178.   Plaintiff David Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

179.   David was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself

after his family had already left for Jerusalem.

180.    Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

181.    As a result of the attack, plaintiff David Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries sustained by his sister and other niece.

182.    Plaintiff Shaina Chava Nadel is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

183.    Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

184.    As a result of the attack, plaintiff Shaina Chava Nadel has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

185.    Plaintiff Blumy Rom is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

186.    Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

187.    As a result of the attack, plaintiff Blumy Rom has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

188.    Plaintiff Rivka Pollack is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

189.    Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

190.    She stayed with her baby niece S.N., caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply affected her.

191.    As a result of the attack, plaintiff Rivka Pollack has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

192.    Plaintiff Rachel Potolski is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

193.    Like the rest of her immediate family, Rachel experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

194.    As a result of the attack, plaintiff Rachel Potolski has experienced severe mental

anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

195.    Plaintiff Ovadia Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

196.    Like the rest of his immediate family, Ovadia experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

197.    As a result of the attack, plaintiff Ovadia Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

198.    Plaintiff Tehilla Greiniman is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

199.    Like the rest of her immediate family, Tehilla experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

200.    As a result of the attack, plaintiff Tehilla Greiniman has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

201.    Plaintiff Yisrael Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

202.    Like the rest of his immediate family, Yisrael experienced the shock and mental

distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

203.     As a result of the attack, plaintiff Yisrael Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

204.     Plaintiff Yitzchak Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

205.     Like the rest of his immediate family, Yitzchak experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

206.     As a result of the attack, plaintiff Yitzchak Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

### THE JAFFA ROAD BUS #14A BOMBING – JUNE 11, 2003

207.     At approximately 5:30 p.m. on June 11, 2003, Abd el-Mu'ati Shabana, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, boarded Egged Bus #14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road near the Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 more, including dozens of bystanders.

### The Beer Family

208.     Alan Beer was a citizen of the United States when he died.

209.     Alan was on the bus returning from a condolence call to his friend's family when

Shabana detonated his explosives and killed him.

210.    Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to have been in the area of the bombing earlier. Harry then telephoned his other sister, plaintiff Estelle Caroll, and informed her of the terrorist attack.

211.    After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body. Thereafter, Alan's mother, Anna Beer, Harry Leonard Beer and Estelle Caroll flew to Israel to attend Alan's funeral.

212.    Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio. He is the brother of Alan Beer.

213.    Anna Beer was a citizen of the United States and a resident of the State of Ohio when she died in 2016. She was the mother of Alan Beer.

214.    Plaintiff Harry Leonard Beer brings this action in his individual capacity, as the executor of the Estate of Alan Beer, and as the executor of the Estate of Anna Beer.

215.    As a result of Alan's death, plaintiff Harry Leonard Beer has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

216.    Plaintiff Estelle Caroll is a citizen of the United States and a resident of the State of Virginia. She is a sister of Alan Beer.

217.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel. She is a sister of Alan Beer.

218.    As a result of Alan's death, plaintiffs Estelle Caroll and Phyllis Maisel have

experienced emotional pain and suffering, loss of their brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

219.    As a result of Alan's death, (before her death) Anna Beer experienced emotional pain and suffering, loss of her youngest child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Singer Family**

220.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

221.    On June 11, 2003, Sarri boarded Bus #14A in Jerusalem to meet a friend for dinner. The bus was filled with rush hour commuters. Eventually she was able to take a seat near the window.

222.    Shortly thereafter, Shabana detonated his bomb only two to three seats away from where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

223.    When the explosives were detonated, Sarri felt a shockwave across her face.

224.    Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle.

225.    After the blast, she was unable to open her left eye, and her right eye was extremely restricted.

226.    Sarri was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.

227.    Barely walking, Sarri was taken to an ambulance.

228.    She incurred wounds to her face and legs resulting in scarring. She underwent

physical therapy and additional surgery.

229.    Shrapnel lodged in Sarri's gums, moving her teeth and necessitating dental work.

230.    As a result of the attack, plaintiff Sarri Anne Singer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

231.    Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Sarri Anne Singer.

232.    Judith learned of the attack when her son telephoned her at work.

233.    As a result of the attack, plaintiff Judith Singer has experienced severe mental anguish and extreme emotional distress.

234.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Sarri Anne Singer.

235.    Eric first learned of the attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

236.    As a result of the attack, plaintiff Eric M. Singer has experienced severe mental anguish and extreme emotional distress.

237.    Plaintiff Robert Singer is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Sarri Anne Singer.

238.    After learning of the attack, Robert traveled to Israel to be with his daughter.

239.    As a result of the attack, plaintiff Robert Singer has experienced severe mental anguish and extreme emotional distress.

## THE COMMUTER BUS #6 BOMBING – MAY 18, 2003

240.    On May 18, 2003, Basem Takruri, a HAMAS suicide bomber, boarded Bus #6, a

commuter bus heading for Jerusalem, and detonated his explosives.

241.    Seven people ranging in age from 35 to 68, were killed by the explosion, and 20 others were injured.

**The Averbach Family**

242.    Steven Averbach was a citizen of the United States and a resident of the State of Israel when he died.

243.    Steven died in 2010 as a result of injuries sustained during the suicide bombing that occurred on May 18, 2003. He was 44 years old.

244.    At the time of the attack Steven resided near Tel Aviv, Israel. He was a married father of four sons ranging in age from 2 to 13 at the time. Steven and his wife, Julie, were married in 1994 and have two sons together, Sean Averbach and Adam Averbach.

245.    Steven's older sons, Tamir and Devir are from a prior marriage.

246.    On May 18, 2003, Steven boarded the commuter bus heading for Jerusalem and took a seat facing the back.

247.    As the bus pulled away from the stop, it suddenly stopped, and the bus driver allowed another passenger to get on.

248.    Steven caught a glimpse of him and saw that he was wearing a heavy coat in warm weather that covered bulges underneath it. He also saw what looked like a trigger mechanism in his right hand.

249.    Having worked in the anti-terrorist division in the Israeli Army and the Israeli Police, knowing that Israeli buses do not usually pick up passengers after they have begun to leave the station, seeing the tension on the faces of the people on the bus, and taking into account Takruri's aforementioned suspicious characteristics, Steven immediately recognized that a

terrorist attack was imminent.

250.    Steven grabbed the gun he carried and turned toward Takruri, who detonated the explosives.

251.    Steven absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

252.    Steven sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

253.    Following surgery, Steve was moved to intensive care where he stayed for five weeks. He almost died there several times because of an extremely high fever and from the blast injury to his lungs. He subsequently underwent numerous operations to his back, groin and gastric intestines. He also had a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

254.    Steven was forced to return to the Intensive Care Unit at least twice with complications.

255.    Steven was paralyzed from his neck down.

256.    On more than one occasion, Steven pleaded with his doctors and family members to take him off of life support.

257.    He was completely dependent on the 24-hour care provided to him and had no foreseeable hope of recovery.

258.    Steven lived in constant pain. He battled depression and took antidepressants.

259.    As a result of the attack, Steven Averbach sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from May 18, 2003 until his death.

260.    Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the widow of Steven Averbach, and the mother of plaintiffs Sean Averbach and Adam Averbach.

261.    Plaintiff Julie Averbach brings this action both individually and as the legal representative of the Estate of Steven Averbach.

262.    As a result of the injuries Steven sustained, Julie had to relocate her family to be closer to the rehabilitation center where Steven resided for nearly a year. Steven moved home from the rehabilitation center in July 2004 but required continuous 24-hour care. Following the attack, Julie was, in most respects, a single parent and could not enjoy the normal companionship, day-to-day assistance and mutual support that she had previously received from her husband.

263.    Julie underwent psychological counseling after the attack.

264.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Julie Averbach has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

265.    Plaintiff Tamir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

266.    After the attack, Tamir underwent psychological counseling for approximately one year.

267.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Tamir Averbach has

experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

268.   Plaintiff Devir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

269.   After the attack, Devir experienced difficulty making friends, his grades declined, he cried, and he felt angry. He also underwent psychological counseling.

270.   Tamir and Devir witnessed their father's relentless and painful suffering and repeated surgeries and brushes with death. They remember what it was like before the attack, when he was an able-bodied man.

271.   As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Devir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

272.   Plaintiff Sean Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

273.   As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father were denied to him.

274.   As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Sean Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

275.    Plaintiff Adam Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

276.    As a result of the brutal attack on his father he has been emotionally traumatized and does not remember a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, playing sports together, or driving in a car with his father were denied to him.

277.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Adam Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

278.    David Averbach was a United States citizen and resident of the State of New Jersey when he died in 2013. He was the father of Steven Averbach.

279.    Plaintiff Maida Averbach is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Steven Averbach.

280.    Plaintiff Maida Averbach brings this action both individually and as the legal representative of the Estate of David Averbach.

281.    Maida Averbach and David Averbach had returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's body leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

282.    After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that

Steven had been grievously wounded by the explosion and a ball bearing had lodged between his C3 and C4 vertebrae.

283.   As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

284.   At the time of the attack, David Averbach and Maida Averbach had partially retired from their jobs so that they could spend more time with Steven and his children.

285.   Following the attack, Steven's constant inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steven's four children were a constant source of anguish to both of his parents.

286.   As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, (before he died) David Averbach experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

287.   Plaintiff Maida Averbach experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack from the moment she saw her son's body on television in the early morning hours of May 18, 2003.

288.   As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Maida Averbach has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

289.   Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steven Averbach.

290.   Michael Averbach has always looked up to his brother and admired him. The

injuries that his brother sustained, as well as his subsequent death, have been a severe emotional blow to Michael.

291.    Since the date of the attack, Michael flew to Israel repeatedly, often at his brother's request, simply to sit by Steven's bedside and talk.

292.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Michael Averbach has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

293.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steven Averbach.

294.    Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

295.    Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack, as well as his subsequent death.

296.    After the attack, she suffered from anxiety and depression, had trouble sleeping, and cried every day.

297.    Since the attack, she lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother, and subsequently resulted in his death.

298.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Eileen Sapadin has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**THE MIKE'S PLACE BOMBING IN TEL AVIV – APRIL 30, 2003**

299.     On April 30, 2003, Asif Muhammad Hanif, a HAMAS suicide bomber, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives,[1] killing three people and injuring more than 50 others.

300.     Hanif, 22, was a British citizen who entered Israel through Jordan.

**The Rozenstein Family**

301.     Plaintiff Daniel Rozenstein is a citizen of the United States and a resident of the State of Florida.

302.     Daniel was seated inside the bar and decided to step outside when he crossed paths with Hanif in the entryway just as he detonated his explosives.

303.     As a result of the attack, Daniel suffered second degree burns over his entire body.

304.     After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for two weeks. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

305.     As a result of the bombing, he sustained severe hearing loss. He has also suffered a permanent loss of balance, is often dizzy, and frequently experiences black outs.

306.     Daniel's right hand no longer functions properly as it is covered in scar tissue. Much of the rest of his body is also covered by scar tissue, including his back.

307.     He also suffers from memory loss, nightmares and post-traumatic stress disorder ("PTSD"). He has also sustained a traumatic brain injury ("TBI") and undergone psychological counseling.

---

[1]        There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

308.    As a result of the attack, plaintiff Daniel Rozenstein has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

309.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a resident of the State of Florida. She is the sister of plaintiff Daniel Rozenstein.

310.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

311.    When Julia first saw Daniel, she did not recognize him because his body was horribly burned, and his face and ears were swollen beyond recognition. She spent many days in the hospital and was there when her brother slipped into a coma.

312.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

313.    As a result of the attack, plaintiff Julia Rozenstein Schon has experienced severe mental anguish and extreme emotional distress.

314.    Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Daniel Rozenstein.

315.    As a result of the attack, plaintiff Alexander Rozenstein has experienced severe mental anguish and extreme emotional distress.

316.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of plaintiff Daniel Rozenstein.

317.    As a result of the attack, plaintiff Esther Rozenstein has experienced severe mental anguish and extreme emotional distress.

## THE SHOOTING ATTACK ON ROUTE #60 - JANUARY 29, 2003

318.    On January 29, 2003, Farah Hamad and Yasser Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60, seriously injuring one person.

**The Steinmetz Family**

319.    Plaintiff Jacob Steinmetz is a citizen of the United States and a resident of the State of Israel.

320.    Plaintiff Deborah Steinmetz is a citizen of the United States and a resident of the State of Israel. She is the wife of plaintiff Jacob Steinmetz.

321.    On January 29, 2003, Jacob was driving their car on Route #60. Deborah sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

322.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

323.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

324.    Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in his elbow.

325.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

326.    Presently, the use of Jacob's arm is greatly limited.

327.    As a result of the attack, plaintiff Jacob Steinmetz has sustained severe physical

injuries and experienced severe mental anguish and extreme emotional distress.

328.   As a result of being in the car that terrorists targeted, plaintiff Deborah Steinmetz has experienced great anxiety and severe mental anguish and extreme emotional distress.

329.   Amichai Steinmetz was a citizen of the United States when he died. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

330.   In 2009, Amichai Steinmetz went missing while on a trip to India. In December 2015, an Israeli court declared Amichai Steinmetz dead.

331.   Following the attack and prior to his declaration of death in 2015, Amichai Steinmetz experienced severe mental anguish and extreme emotional distress as a result of the attack.

332.   Plaintiffs Jacob Steinmetz and Deborah Steinmetz bring this action both individually and on behalf of the Estate of Amichai Steinmetz.

333.   Plaintiff Nava Steinmetz is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

334.   Plaintiff Orit Mayerson is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

335.   Plaintiff Netanel Steinmetz is a citizen of the United States and a resident of the State of Israel. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

336.   As a result of the attack, plaintiffs Nava Steinmetz, Orit Mayerson and Netanel Steinmetz have experienced severe mental anguish and extreme emotional distress.

### THE HEBREW UNIVERSITY CAFETERIA BOMBING – JULY 31, 2002

337.   On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb

planted inside the cafeteria exploded, killing nine people, five of them Americans, and injuring as many as 70 others.

338.    HAMAS planned and perpetrated the attack.

339.    Mohammad Odeh, a HAMAS operative, who worked at Hebrew University as a painter for an Israeli contractor, set off the bomb.

**The Coulter Family**

340.    Janis Ruth Coulter was a citizen of the United States when she died.

341.    Janis was in the cafeteria when the bomb exploded, killing her and injuring her friend who was eating lunch with her.

342.    Janis was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

343.    She had arrived in Israel just one day before the bombing to accompany a group of 19 American students who were scheduled to attend classes at the university.

344.    Robert L. Coulter, Sr. was a citizen of the United States and a resident of the State of Massachusetts when he died in 2018. He was the father of Janis Ruth Coulter.

345.    Robert L. Coulter, Sr.'s widow, Ann Coulter, brings this action on behalf of the Estate of Robert Coulter, Sr.

346.    Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw Janis's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Robert L. Coulter, Sr. and his daughter desperately tried to reach Janis on her cell phone without success.

347.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the

State of Massachusetts. She is the sister of Janis Ruth Coulter.

348.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Janis Ruth Coulter.

349.    Plaintiffs Dianne Coulter Miller and Robert L. Coulter, Jr. bring actions individually and as the legal representatives of the Estate of Janis Ruth Coulter.

350.    Robert L. Coulter, Jr. had heard about the bombing on the radio on the way to work but did not make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria, whereupon he drove immediately to his father's house.

351.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

352.    As a result of Janis's death, (before his own death in 2018) plaintiff Robert L. Coulter, Sr. experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

353.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

354.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Carter Family**

355.    Diane Leslie Carter was a citizen of the United States when she died.

356.    She was eating lunch in the cafeteria when the bomb exploded.

357.    Diane was killed by the bomb blast.

358.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

359.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Leslie Carter.

360.    Plaintiff Larry Carter brings this action both individually and as the Administrator of the Estate of Diane Leslie Carter.

361.    Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

362.    Plaintiff Shaun Choffel is a citizen of the United States and a resident of the State of Virginia. She is the sister of Diane Leslie Carter.

363.    Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

364.    As a result of Diane's death, plaintiff Larry Carter has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

365.    As a result of Diane's death, plaintiff Shaun Choffel has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Blutstein Family**

366.    Benjamin Blutstein was a citizen of the United States when he died.

367.    He was killed by the bomb blast.

368.    Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

369.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' hometown of Harrisburg, Pennsylvania.

370.    Plaintiff Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. He is the father of Benjamin Blutstein.

371.    Plaintiff Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania. She is the mother of Benjamin Blutstein.

372.    Plaintiffs Richard Blutstein and Katherine Baker bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

373.    Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

374.    Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and heard a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, Richard received a call confirming Benjamin's death.

375.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then

composed herself enough to inform her daughter, Rebekah.

376.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

377.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

378.    Although Rebekah's father had informed her about the attack, Rebekah learned that her brother had died when her mother telephoned her.

379.    As a result of Benjamin's death, plaintiff Rebekah Blutstein has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Gritz Family**

380.    David Gritz was a citizen of the United States when he died.

381.    He was killed by the bomb blast.

382.    He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

383.    He died after being in Israel for only two weeks.

384.    Norman Gritz was a citizen of the United States and a resident of France when he died in 2005. He was the father of David Gritz.

385.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

386.    Plaintiff Nevenka Gritz brings this action individually and on behalf of the Estate

of David Gritz and the Estate of Norman Gritz.

387.    Nevenka and Norman were in New York on the day their son was murdered. Friends informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

388.    As a result of David's death, (prior to his death) Norman Gritz experienced emotional pain and suffering, loss of his only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

389.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of her only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING – MAY 7, 2002

390.    On the night of May 7, 2002, Muhammad Muammar, a HAMAS suicide bomber, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

391.    Fifteen people were killed in the attack, and more than 50 others were injured.

**The Bablar Family**

392.    Esther Bablar was a citizen of the United States when she died.

393.    Although Esther initially survived the attack, she died of her injuries the following morning.

394.    Plaintiff Jacqueline Chambers is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

395.    Plaintiff Levana Cohen is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

396.    Plaintiffs Jacqueline Chambers and Levana Cohen bring actions both individually and on behalf of the Estate of Esther Bablar.

397.    Esther had spent the month before the bombing in Florida with her youngest daughter, Levana, who had just given birth to Esther's grandchild. The day before the attack she had been in New York visiting her other daughter, Jacqueline.

398.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified, and they quickly made arrangements to fly to Israel with their aunt and uncle.

399.    As a result of Esther's death, plaintiff Jacqueline Chambers has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

400.    As a result of Esther's death, plaintiff Levana Cohen has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

401.    Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar. He is being represented by his legal guardian, plaintiff Jacqueline Chambers.

402.    As a result of Esther's death, plaintiff Eli Cohen has experienced emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

403.    Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

404.    As a result of Esther's death, plaintiff Sarah Elyakim has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

405.    Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of New York. He is the brother of Esther Bablar.

406.    As a result of Esther's death, plaintiff Joseph Cohen has experienced emotional pain and suffering and the loss of his sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA – MARCH 27, 2002

407.    On March 27, 2002, Abd al-Baset Odeh, a HAMAS suicide bomber, blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

408.    Thirty people were killed, and 140 others were injured.

**The Rogen Family**

409.    Hannah Rogen was a citizen of the United States when she died.

410.    Hannah was severely wounded in the attack and died of her wounds six days later, on April 2, 2002.

411.    Hannah was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

412.    Greta Geller is the great niece of Hannah Rogen. She, along with Ilana Dorfman, Rephael Kitsis, and Tova Guttman, bring this action as the court-appointed administrators of the Estate of Hannah Rogen.

### THE BEN YEHUDA STREET BOMBINGS – DECEMBER 1, 2001

413.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Bahar, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed, and 188 others were injured.

414.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Spetner Family**

415.    Plaintiff Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

416.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

417.    As a result of the attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

418.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

419.    Temima has also experienced psychological trauma as a result of the attack.

420.    As a result of the attack, plaintiff Temima Spetner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

421.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

422.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

423.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

424.    When he got up the second time, he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

425.    Jason was taken to Shaare Zedek Hospital in Jerusalem where he underwent two operations. Surgeons removed 8 metal bolts from his arm, leg and back.

426.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

427.    As a result of the attack, plaintiff Jason Kirschenbaum has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

428.    Plaintiff Isabelle Kirschenbaum is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jason Kirschenbaum.

429.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York when he died in 2008. He was the father of plaintiff Jason Kirschenbaum.

430.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

431.    Isabelle first learned of the double suicide bombing while watching CNN. After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

432.    As a result of the attack, plaintiff Isabelle Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

433.    Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

434.    As a result of the attack, (before his death) Martin Kirschenbaum experienced severe mental anguish and extreme emotional distress.

435.    Plaintiff Joshua Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

436.    Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle telephoned Joshua to advise him that his brother Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Zedek Hospital in Jerusalem.

437.    As a result of the attack, plaintiff Joshua Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

438.    Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of plaintiff Jason Kirschenbaum.

439.     As a result of the attack, plaintiff Shoshana Burgett has experienced severe mental anguish and extreme emotional distress.

440.     Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

441.     As a result of the attack, plaintiff David Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

442.     Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of plaintiff Jason Kirschenbaum.

443.     As a result of the attack, plaintiff Danielle Teitelbaum has experienced severe mental anguish and extreme emotional distress.

**The Miller Family**

444.     Plaintiff Netanel Miller is a citizen of the United States and a resident of the State of Israel.

445.     On the evening of December 1, 2001, Netanel was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet away from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

446.     A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

447.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

448.    Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

449.    Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

450.    Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

451.    Netanel was admitted to the hospital and remained there for two days.

452.    Netanel endured the pain in his leg for nearly two years.

453.    The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

454.    It is still painful for Netanel to hike, an activity that he has always enjoyed.

455.    Netanel had flashbacks as a result of the attack and underwent psychological counseling.

456.    As a result of the attack, plaintiff Netanel Miller has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

457.    Plaintiff Chaya Miller is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Netanel Miller.

458.    Plaintiff Arie Miller is a citizen and resident of the State of Israel. He is the father of plaintiff Netanel Miller.

459. Upon learning that their son Netanel had been injured in the bombing and knowing he has suffered greatly as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

460. As a result of the attack, plaintiffs Chaya Miller and Arie Miller have experienced severe mental anguish and extreme emotional distress.

461. Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of plaintiff Netanel Miller.

462. Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

463. Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

464. As a result of the attack, plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional distress.

**The Steinherz Family**

465. Plaintiff Altea Steinherz is a citizen of the United States and a resident of the State of Israel.

466. Plaintiff Jonathan Steinherz is a citizen of the United States and a resident of the State of Israel. He was the husband of plaintiff Altea Steinherz at the time of the attack.

467. On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

468. Altea wanted to get home to her daughter who was with a babysitter at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

469.     A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

470.     While walking in the street, they saw a crazed-looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

471.     As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

472.     She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

473.     Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

474.     Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

475.     Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

476.     Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

477.     As a result of the attack, plaintiff Altea Steinherz sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

478.     As a result of the attack, plaintiff Jonathan Steinherz experienced severe mental anguish and extreme emotional distress.

479.     Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of plaintiffs Altea Steinherz and Jonathan Steinherz.

480.     As a result of the attack, plaintiff Temima Steinherz has experienced severe mental

anguish and extreme emotional distress.

481.    Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Altea Steinherz.

482.    As a result of the attack, plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional distress.

483.    Plaintiff Peter Steinherz is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Jonathan Steinherz.

484.    Plaintiff Laurel Steinherz is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jonathan Steinherz.

485.    As a result of the attack, plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional distress.

## PATT JUNCTION BUS # 32A BOMBING – JUNE 18, 2002

486.    At approximately 7:50 a.m. on June 18, 2002, Muhamad al-Ghoul, a HAMAS terrorist, boarded Bus #32A in the Gilo neighborhood of Jerusalem. Almost immediately, he detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. Nineteen people were killed, and 74 others were injured.

### The Aluf Family

487.    Boaz Aluf was a citizen of the State of Israel when he died.

488.    Plaintiff Gila Aluf is a citizen of the United States and a resident of the State of Israel. She is the widow of Boaz Aluf.

489.    On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus #32A when al-Ghoul detonated the

bomb.

490.    As a result of Boaz's death, plaintiff Gila Aluf has experienced emotional pain and suffering, and the loss of her husband's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE ARIEL BOMBING – OCTOBER 27, 2002

491.    On October 27, 2002, Muhammad Kazid Faysal al-Bustami, a HAMAS suicide bomber, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 other people.

**The Zahavy Family**

492.    Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

493.    On October 27, 2002, Yitzhak was waiting with his platoon for a transport pickup at a gas station at the entrance to the town of Ariel.

494.    Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

495.    Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Bustami before he detonated his explosives.

496.    Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

497.    The emotional effects of the attack continue to affect Yitzhak to the present day.

498.    As a result of the attack, plaintiff Yitzhak Zahavy has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

499.    Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of plaintiff Yitzhak Zahavy.

500.    As a result of the attack, plaintiff Julie Zahavy has experienced severe mental

anguish and extreme emotional distress.

501.    Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Yitzhak Zahavy.

502.    Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Yitzhak Zahavy.

503.    As a result of the attack, plaintiffs Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional distress.

### B.    The Defendant

504.    Defendant BLOM BANK is a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.

505.    BLOM BANK was established in 1951 as Banque du Liban et D'Outre Mer. In 2000, it changed its name to BLOM BANK. By 2016, BLOM BANK was Lebanon's largest bank by market capitalization, with revenue of $2.35 billion and total assets of $29.52 billion. It has over 4,000 employees.

506.    In 1962, Dr. Naaman Azhari was appointed as General Manager of BLOM BANK S.A.L. In 1971, Dr. Azhari was appointed as Chairman of the bank. Dr. Azhari occupied the two positions until 2007, when he was appointed as Chairman of BLOM BANK Group. His son, Saad Azhari, has subsequently served as Chairman of the Board and General Manager of BLOM BANK. Saad Azhari also serves as the Vice-President of the Association of Banks in Lebanon ("ABL"), a cooperative association of approximately 65 banks in Lebanon.[2]

507.    During the relevant period (1998-2004), BLOM BANK conducted business in the

---

[2]    The association includes, *inter alia*, Bank Saderat and al-Bilad Islamic Bank, both of which were designated SDGTs by the U.S. Treasury Department. Although Bank Saderat was designated in 2007, its membership in ABL was not suspended until 2014.

United States and in New York through correspondent bank accounts at Bank of New York, Citibank and American Express Bank.

## FACTUAL ALLEGATIONS

## I. THE ISLAMIC RESISTANCE MOVEMENT (HAMAS)

### A. HAMAS's Founding

508.   Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS"), a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

509.   HAMAS[3] was established in the Gaza Strip on December 10, 1987, shortly following the outbreak of the First Intifada.[4] HAMAS announced its founding in an "official" communique on December 14, 1987.

510.   It represented the culmination of approximately 15 years of preparation and organization building, led by Ahmed Yassin (also known as "Sheikh Yassin"), the unrivaled leader of what had been the Muslim Brotherhood Movement in the Gaza Strip.[5]

511.   Although Yassin had been confined to a wheelchair throughout his adult life, he worked unceasingly for the establishment of HAMAS in the Gaza Strip. When HAMAS was established in Yassin's home in 1987, the Islamic Resistance Movement already had a defined ideology and a group of pre-existing institutions in Gaza, such as *Al-Mujama Al-Islami* (the Islamic

---

[3]      HAMAS is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*" – Islamic Resistance Movement – but its name also means, in Arabic, enthusiasm, courage, zeal for battle.

[4]      The term "First Intifada," as used herein, relates to the violent conflict that broke out in December 1987 between the Palestinians and Israel.

[5]      The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna, and was dedicated to the goal of fighting Western influences on Muslim society; ensuring the adherence of Muslims to Islamic law (Shari'a); and following the rectification of Muslim society, to eventually establish an Islamic state that would expand its rule over the world by means of jihad and a call to join Islam.

Center) founded in 1973, *Al-Jam'iya Al-Islamiya* (the Islamic Society) founded in 1976, and the Islamic University of Gaza, that were the flagship institutions of the Brotherhood's civilian social framework – the *da'wa*.[6]

512.    On December 10, 1987, after violence broke out in the Jabalia Refugee Camp, Sheikh Yassin invited six of the leaders of the Muslim Brotherhood in Gaza to his home.

513.    There the group decided on the establishment of HAMAS, an organization that would combine terror against Israel with the *da'wa* (social welfare activities), through organizations such as *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya*. The seven participants of that group are considered by HAMAS to be its founding fathers.

514.    In an interview reported in the *Filisteen al-Muslima* newspaper in January 1998, Dr. Ibrahim al-Yazuri, one of the original founding fathers of HAMAS, offered a telling description of HAMAS's philosophy regarding charitable giving:

> Everyone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine, from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern. Social work is carried out in support of this aim, and it is considered to be part of the HAMAS movement's strategy . . . The HAMAS movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. The movement takes care of their families and their children and provides them with as much material and moral support as it can. This is one of the fundamental truths of Islamic work and thus represents the duties of the Islamic state . . . The movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.

---

[6]       The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to "the civilian infrastructure of Hamas."

### B.      HAMAS Rejected the Oslo Accords

515.    In December 1992, as a result of increased terrorist activity perpetrated by HAMAS, the government of Israel decided to deport over 350 HAMAS operatives to Marj al-Zuhur in Lebanon. The location became a training camp for the operatives, and an incubator of radicalism. This later became known as the "*Marj al-Zuhur* Deportation."

516.    The *Marj al-Zuhur* Deportation was a formative moment in the history of HAMAS, assigning it almost mythical status. It established HAMAS's status as a leading Palestinian political organization and brought it to prominence in the Arab and international arenas. HAMAS members who were deported to *Marj al-Zuhur* have a special place in the movement's history, and quickly became the most iconic members of HAMAS and the leadership of the HAMAS *da'wa.*

517.    The international community condemned the deportations, and at the end of 1993, the Israeli Supreme Court ultimately determined that the Government of Israel was compelled to accept the return of the *Marj al-Zuhur* deportees.

518.    On September 13, 1993, President Clinton hosted the signing ceremony in Washington, D.C. for the so-called "Oslo Accords" presented by Palestine Liberation Organization ("PLO") Chairman Yasser Arafat and Israeli Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.

519.    The Oslo Accords had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority ("PA"), headed by Arafat. Under the agreement, the newly-formed PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.

520.    The agreement also included Letters of Mutual Recognition, whereby the Israeli

government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized Israel's existence and purportedly renounced terrorism, violence, and the desire for the destruction of Israel.

521.    The Oslo Accords were not, however, universally accepted by the Palestinian factions. HAMAS, which historically did not accept the secular PLO as the sole official representative of the Palestinian people, rejected the agreement for its recognition of Israel's right to exist. The Oslo Accords contradicted HAMAS's most valued tenet – the destruction of the State of Israel and the creation of an Islamic state in its place.

522.    Accordingly, HAMAS pursued a three-pronged strategy in the early 1990s.

523.    First, it upgraded its terror apparatus by perfecting its bomb-making skills and improving the capabilities of its military wing, the *Izz al-Din al-Qassam* Brigades (herein, the "Qassam Brigades").

524.    Second, it intensified its efforts to systematically gain control of pre-existing *zakat*[7] committees and other religious and social institutions that would ultimately compete with the PA for the "hearts and minds" of the Palestinian public in Gaza, the West Bank and even the Palestinian refugee camps in Jordan and Lebanon.

525.    Third, it accelerated the development of its world-wide fundraising network. While HAMAS enjoyed support from wealthy patrons in the Persian Gulf even in its prior incarnation as Sheikh Yassin's Muslim Brotherhood branch in Gaza, the Oslo Accords galvanized its supporters in Europe, Africa and even the United States.

526.    Sanabil Association for Relief and Development, Subul al-Khair and the Islamic Welfare Association (Lebanon) were all *da'wa* institutions in Lebanon tasked by HAMAS to

---

[7]      *Zakat* is a form of alms-giving treated in Islam as a religious obligation, second in importance to prayer.

extend HAMAS's reach into the Palestinian refugee camps where the organization was competing both with its long-time Palestinian nemesis, Fatah, and the growing power and appeal of Hezbollah.

527. HAMAS fundraisers and other operatives located abroad are key members of the HAMAS *da'wa*, closely tied to *da'wa* and Qassam Brigades operatives on the ground in the West Bank and the Gaza Strip, as well as to HAMAS political leaders in Lebanon, Turkey, Qatar and elsewhere in the Middle East.

528. HAMAS's fundraising activities became the subject of public knowledge not long after it was formed. In 1994, *The New York Times* reported:

> HAMAS funding of all its activities is estimated by the Israelis at about $30 million a year. It comes from money collected by associations operating largely abroad but with ties to the international Muslim Brotherhood network. Money is also collected from Islamic and Arab communities in the United States and in Britain, the Netherlands and other Western European locations.

529. Similarly, in 1996, *The New York Times* reported:

> Israeli, Palestinian and Western intelligence officials say Jordan is a major conduit for much of the HAMAS budget, estimated at $70 million a year, nearly all of it for the social service network of mosques, hospitals, schools and other institutions that form the movement's political base in the West Bank and Gaza Strip.

> …Jordan, intelligence officials say, is a major path through which money reaches the HAMAS network of mosques and charities. Jordanian intelligence reports indicate that much of the money is coming from the Persian Gulf emirates and Saudi Arabia.

530. A *Washington Post* article in 2001 reported that, "[a]ccording to [Sheikh] Yassin, [HAMAS] distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; 'martyrs' who have been killed by Israelis; and prisoners in Israeli jails."

531. During this time, emboldened by increased support and intensified zeal, HAMAS broadened its operations from kidnapping and executing people suspected of cooperating with

Israel to murdering civilians in Israel. In 1994 alone, HAMAS carried out three separate suicide

bombings of buses in Israel, killing 35 people.

### C.     The U.S. Government Designated Hamas

532.    On January 23, 1995, President Clinton issued Executive Order No. 12947

designating HAMAS as a "Specially Designated Terrorist" ("SDT").  President Clinton found that

"grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East

peace process constitute an unusual and extraordinary threat to the national security, foreign

policy, and economy of the United States."

533.    Executive Order No. 12947 blocks all property and interests in property of the

terrorist organizations and persons designated in the Order, including HAMAS. This designation

made it illegal for any United States person or entity to engage in any unlicensed transactions or

dealings involving the property or interests of HAMAS. HAMAS's designation as an SDT

organization has remained in place since January 24, 1995.

534.    HAMAS continued its terrorist activities, bombing a bus in Jerusalem on February

25, 1996. HAMAS claimed responsibility for the bombing, which killed 26 people and injured 80.

Six of the victims were U.S. citizens. That year, under heavy pressure from Israel and the PLO

under the leadership of Yasser Arafat, the recently-established Palestinian Authority very publicly

took steps against HAMAS as a result of a wave of HAMAS terrorist attacks. Over the coming

years, the PA would, from time to time, attempt to take measures against the *zakat* committees and

charitable societies run by HAMAS. Closures and arrests, however, were always temporary.

535.    On October 8, 1997, by publication in the Federal Register, the United States

Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219

of the Immigration and Nationality Act and the AEDPA. As a result of this designation, it became

illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to HAMAS.

536.    The designation of HAMAS as an FTO has been renewed every two years since 1997.

537.    On October 31, 2001, after the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order No. 13224 designated HAMAS as a Specially Designated Global Terrorist ("SDGT"). Executive Order No. 13224 blocked all property and interests in property of the SDGTs, including HAMAS. HAMAS's designation as an SDGT organization has remained in place since October 31, 2001.

###    D.    HAMAS's European Fundraising Network

538.    Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), HAMAS's primary fundraiser in France, was founded in 1990 and registered there as a non-profit organization.

539.    The Israeli government declared CBSP an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

540.    Interpal, HAMAS's most important fundraising organization in the United Kingdom, was formally registered as a charity with the U.K. Charity Commission on August 11, 1994 under the name "Palestinian Relief and Development Fund."

541.    As early as 1995, published reports in Israel linked Interpal to HAMAS.

542. The Israeli government declared Interpal an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions and subsequently declared it a terrorist organization on January 17, 1998.

543. On August 22, 2003, following the deadly suicide bombing aboard Bus #2 in Jerusalem on August 19, 2003 in which Tehilla Nathansen was killed and multiple members of her family severely injured, the U.S. Treasury Department designated five HAMAS-related institutions and six senior HAMAS leaders as SDGTs.

544. The five HAMAS-related charities that were designated as SDGTs were:

1. Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), of France.

2. Association de Secours Palestinien ("ASP"), of Switzerland (an organization affiliated with CBSP).

3. Palestinian Relief and Development Fund, or Interpal, headquartered in the United Kingdom.

4. Palestinian Association in Austria ("PVOE").

5. Sanabil Association for Relief and Development based in Lebanon.

545. The U.S. Treasury Press Release announcing the designations of these five entities stated:

> The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS.

546. According to the U.S. Treasury Department, "Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS. Reporting indicates it is the conduit through which money flows to HAMAS from other charities, e.g., the Al Aqsa Foundation (designated under EO 13224 on May 29th) and oversees the activities of other

charities. … Reporting indicates that Interpal is the fundraising coordinator of HAMAS. This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy."

547.    According to the U.S. Treasury Department, "CBSP and ASP are primary fundraisers for HAMAS in France and Switzerland, respectively. Founded in France in the late 80s/early 90s, CBSP acts in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon. ASP, a subsidiary of CBSP, was founded in Switzerland in 1994. The group has collected large amounts of money from mosques and Islamic centers, which it then transfers to sub-organizations of HAMAS. Khalid Al-Shuli is the president of CBSP and ASP."

548.    According to the U.S. Treasury Department, "PVOE is controlled by the leader of HAMAS in Austria. The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part of the HAMAS network of charitable organizations that includes the Al Aqsa Foundation."

549.    The Al-Aqsa Foundation, one of HAMAS's leading fundraising organizations, had branch offices in Holland, Belgium, Denmark, Sweden, Yemen, South Africa, and Pakistan. It was founded in July 1991 in Germany (Al-Aqsa e.V.), where it was headquartered, and which served as its main branch until at least 2002.

550.    On May 6, 1997, Israel outlawed the Al-Aqsa Foundation (including its German headquarters). On January 19, 1998, Israel declared it a terrorist organization.

551.    In July 2002, the German government closed the offices of the Al-Aqsa Foundation

located in Germany.

552. According to the closure order, "AL-AQSA e.V. advocates, supports and calls for violence as means to achieve political, religious or other goals by awakening or at least strengthening the willingness of third parties to use violence as a political, religious or other means."

553. On May 29, 2003, the U.S. Treasury Department designated all branches of the Al-Aqsa Foundation as an SDGT pursuant to Executive Order 13224.

554. The U.S. Treasury Press Release announcing Al-Aqsa's designation stated:

> Al Aqsa is a critical part of HAMAS' terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al Aqsa funnels money collected for charitable purposes to HAMAS terrorists.
>
> Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

### E.   HAMAS in the United States – The Holy Land Foundation

555. In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the so-called "Palestine Committee" in the United States gathered together in Philadelphia, Pennsylvania to discuss how to help HAMAS oppose the Oslo Accords.

556. The Federal Bureau of Investigation ("FBI") learned of the Philadelphia meeting and obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

557. During the meeting, the participants discussed the problems that the Oslo Accords presented for those opposed to co-existence with Israel, and attendees were admonished not to mention "HAMAS," but rather to refer to it as "Samah," which is HAMAS spelled backwards.

558.    Attendees agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting HAMAS's vital social recruitment effort by financially supporting institutions, organizations and programs in the West Bank and Gaza aligned with HAMAS.

559.    Attendees identified several charitable societies and *zakat* committees as "ours."

560.    The Holy Land Foundation ("HLF") emerged from the Philadelphia meeting as the preeminent HAMAS fundraising organization in the United States.

561.    However, neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of HAMAS.

562.    While HLF was a vital member of HAMAS's international network of organizations dedicated to financing HAMAS's agenda, it also worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of HAMAS-controlled charitable societies and *zakat* committees in the West Bank and Gaza.

563.    The HLF had offices in Texas, California, New Jersey and Illinois, and quickly became the crown jewel in HAMAS's global fundraising network. HLF paid for Jamil Hamami, HAMAS's leader in the West Bank, to take at least 6 trips to the United States between September 1990 and November 1991 so that he could appear as a guest speaker at HLF fundraising events. It also paid for another HAMAS leader, Sheikh Mohammad Siam, to travel to the United States and appear at fundraisers. These trips followed a decision by then HAMAS Political Bureau head Mousa Abu Marzook to designate HLF as HAMAS's primary fund-raising entity in the United States.

564.    Since 1995, when it first became illegal to provide financial support to HAMAS, HLF provided over $12,400,000 in funding to HAMAS through various HAMAS-affiliated

committees and organizations located in Palestinian-controlled areas and elsewhere. In the year 2000 alone, HLF raised over $13 million. An FBI investigation "determined that a majority of the funds collected by the [HLF] are used to support HAMAS activities in the Middle East."

565.   This is unsurprising given the close familial relationships between HLF officers and known HAMAS leaders in the Middle East. Shukri Abu Baker, the CEO of HLF, was the brother of HAMAS leader Jamal Issa. HLF's co-founder, Ghassan Elashi, was related by marriage to Mousa Abu Marzook, while former HLF Chairman Mohammed el-Mezain was Marzook's cousin. HLF member Mufid Abdelqader was a cousin of Khalid Mishal, who would later become HAMAS's external (and supreme) leader. Both Mishal and Marzook were designated SDGTs by the Treasury Department in 2003. Marzook was also designated an SDT in 1995.

566.   According to a November 5, 2001 memorandum written by the Assistant Director of the FBI's Counterterrorism Division, Dale Watson (the "2001 FBI Watson Memo"):

> [E]vidence strongly suggests that the [HLF] has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the [HLF] assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace. According to [an informant], in the words of Shukri Abu Baker, [HLF's] mission is to support the families of the martyrs.

567.   The U.S. Treasury Department designated HLF as an SDGT on December 4, 2001. In 2004, HLF and several of its directors were indicted on criminal charges that HLF was illegally supporting HAMAS.

568.   In 2008, a jury found HLF and five of its former directors guilty of transferring more than $12 million to HAMAS.

569.   The convictions were affirmed in 2011 by the U.S. Court of Appeals for the Fifth Circuit.

### F.    HAMAS in Lebanon

570.    Although estimates vary, during the relevant period Palestinian refugees in Lebanon numbered approximately 300,000 and constituted the second-largest Palestinian diaspora community.

571.    Since its inception in 1982, Hezbollah has made steady political inroads within this community.

572.    For example, Hezbollah has provided residents of the Shatila refugee camp with potable water and supplies diesel for the rundown power generators.

573.    However, as a fanatical Shi'a organization, there are intrinsic limits on Hezbollah's ability to co-opt and speak for Palestinian refugees in Lebanon, who are overwhelmingly Sunni.

574.    In 1994, HAMAS established Sanabil Association for Relief and Development, with the unofficial goal of competing with Hezbollah's social welfare infrastructure.

575.    Immediately after Israel launched its "Grapes of Wrath" operation in southern Lebanon in 1996 to end rocket attacks on Northern Israel by Hezbollah, Sanabil distributed more than $l00,000 to the inhabitants of the southern regions who had taken refuge in Sidon as part of its initial effort to compete with Hezbollah.

576.    In late 1999, the Syrian regime authorized HAMAS's political bureau in Damascus and Beirut, represented by Mousa Abu Marzook and Khalid Mishal, to take over the Lebanese Muslim Brotherhood's networks in the Palestinian refugee camps.

577.    This provided the Syrian regime a way to further exert control over HAMAS's leadership outside the Palestinian Territories and served as a means for the Syrian leadership to promote Islamists in Lebanon who were primarily focused on attacking Israel rather than settling internal scores within the fractured Palestinian community.

578.    The emerging presence of HAMAS in the Palestinian refugee camps was widely publicized in the Lebanese press, and for Syria, it provided a way to hamper the progress of the even more radical (anti-Shi'a and anti-Syrian) Salafist jihadist groups that were developing in Lebanon.

579.    In the Palestinian refugee camps in southern Lebanon, HAMAS and Palestinian Islamic Jihad compete with secular parties for political hegemony and influence. Their main opponent is the biggest PLO faction, Fatah.

580.    Fatah is the largest, oldest and best organized of the political movements and has offices and representatives in most camps in Lebanon, especially in the camps to the south. The organization was, at least during the 1990s, also better funded and therefore able to underwrite social welfare programs, which propelled HAMAS's need to obtain more funding than those of its political rivals.

581.    To secure the support of the Palestinian community in Lebanon, HAMAS deliberately focused most of their criticism on the PLO's leaders.

582.    HAMAS leaders in Lebanon publicly accused the Palestinian Authority of encouraging refugees to settle permanently in the country and give up their "right of return" to Palestine.

583.    In 1998, HAMAS helped create a "Palestinian Ulema League" which was intended as an umbrella group for Palestinian Islamic factions in Lebanon that wanted to challenge what they saw as the PLO's discredited leadership.

584.    Thus, during the Camp David peace negotiations of July 2000 that preceded the Second Intifada, the Palestinian Ulema League published *fatwas* (religious edicts) forbidding Palestinians to leave Lebanese territory if a regional settlement was reached that called for

Palestinian refugees to emigrate to Europe or elsewhere.

585.    Thus, on a smaller scale than it operated in the Palestinian Territories, HAMAS pursued the same tactics and goals in Lebanon, using a combination of propaganda, social welfare and cash grants and a commitment to violence to energize and gain the loyalty of the Palestinians of Lebanon.

586.    For its part, Lebanon turned a blind eye to HAMAS's activities, including its substantial financial activity in Lebanon.

587.    For example, senior HAMAS activist Jamal al-Tawil, who was one of the Movement's most important operatives in the Ramallah area, was arrested by Israel in 2002 and later told his interrogators that he received $12,000 per month from HAMAS's leadership in Lebanon. Other notorious HAMAS operatives in the Palestinian Territories ranging from Abbas al-Sayed (mastermind of the Park Hotel suicide bombing in Netanya) to Jamal Mansur, one of HAMAS's senior operatives in Nablus to Sheikh Ahmed Yassin himself, received funds transfers from representatives of HAMAS's bureau in Lebanon.

## II.    BLOM BANK'S HAMAS CUSTOMERS

### A.    Sanabil Association for Relief and Development – HAMAS's *Da'wa* Headquarters in Lebanon

588.    The Sanabil Association for Relief and Development ("Sanabil"), based in Sidon, Lebanon, was HAMAS's *da'wa* headquarters in Lebanon until late 2003. Between 1998 and 2001, it received millions of dollars in support from HAMAS's fundraising network, including designated organizations such as HLF, Interpal, CBSP and the Al-Aqsa Foundation, and then channeled those funds to the Palestinian refugee camps in Lebanon to build HAMAS's support within that community.

589.     On August 23, 2003, the Lebanese newspaper *Al-Saffir* published a report stating

that in August 2001, following an order given by a HAMAS political leader (whose name was not

mentioned), Sanabil opened offices in all of the Palestinian refugee camps in Lebanon in order to

increase its activity.

590.     Sanabil was designated by the U.S. Treasury Department as an SDGT on August

22, 2003 for its affiliation with FTO HAMAS. According to the Treasury Department:

> The Sanabil Association for Relief and Development (Sanabil), based in Sidon, Lebanon, receives large quantities of funds raised by major HAMAS-affiliated charities in Europe and the Middle East and, in turn, provides funding to HAMAS. For example, Sanabil has received funding from the Al Aqsa Foundation (designated as an SDGT under EO 13224 in May 2003); the Holy Land Foundation for Relief and Development (designated as an SDGT under EO 13224 in December 2001), and Interpal (designated as an SDGT under EO 13224 as part of this tranche). HAMAS recruits permanent members from the religious and the poor by extending charity to them from organizations such as Sanabil.
>
> At the request of a HAMAS political leader, Sanabil began opening offices in all of the Palestinian refugee camps in Lebanon in August of 2001 in order to increase the foundation's role inside the camps. After starting by providing basic necessities the charity eventually began asking poor families within the camps to fill out application forms, particularly those who had worked with the Islamic Movement (Al-Haraka al-Islamiyya) and HAMAS. As a result of these efforts, Sanabil has increased its scope of influence within the camps.[8]

591.     Unsurprisingly, Sanabil's board members were predominantly well-known

HAMAS leaders in Lebanon. For example, HAMAS's current senior leader in Lebanon, Ahmed

Muhammad Abd al-Hadi, served on Sanabil's board of trustees (over the years he was also

HAMAS's deputy representative and spokesman in Lebanon).

592.     Abdallah Atawat served as Sanabil's Deputy Chairman of the Board of Trustees

and as a board member of the Welfare Association for Palestinian and Lebanese Families

---

[8]     "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," *U.S. Department of the Treasury Press Release*, August 22, 2003.

(subsequently designated by the U.S. Treasury Department as an SDGT). Atawat is regarded as one of HAMAS's principal fundraisers in Lebanon.

593. Id Yihya al-Mari was General Manager and Secretary of Sanabil's Board of Trustees. He also served as coordinator of the Union of Good in Lebanon (subsequently designated by the U.S. Treasury Department as an SDGT), discussed below.

594. Other members of the HAMAS leadership in Lebanon who served as trustees of Sanabil included Mashhur Abd al-Halim, who served as the Palestinian relations representative of HAMAS in Lebanon, and Ziyad Qamr, a HAMAS political official.

595. During the relevant period (1999-2003) Sanabil held account # 12-02-44037-728529-1 at Defendant BLOM BANK in Sidon, Lebanon.

596. To illustrate, between 1998 and 2001, HLF transferred over $2 million U.S. dollars through BLOM BANK's correspondent bank accounts in New York to Sanabil's bank account(s) at BLOM BANK in Lebanon.

597. In 2000, HLF transferred over $1 million through BLOM BANK's correspondent bank accounts in New York to Sanabil's bank account(s) at BLOM BANK in Lebanon.

598. In 2001, HLF transferred over $350,000 through BLOM BANK's correspondent bank accounts in New York to Sanabil's bank account(s) at BLOM BANK in Lebanon.

599. The table below provides some sense of the magnitude of the payments:

| 3/1/2000 | $47,095.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
|---|---|---|---|
| 3/21/2000 | $90,174.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 4/5/2000 | $48,811.00 | HOLYLAND FOUNDATION | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT |

| | | GENERAL | SIDON LEBANON |
|---|---|---|---|
| 5/26/2000 | $29,054.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 7/7/2000 | $24,319.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 7/28/2000 | $11,072.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 9/18/2000 | $58,349.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 10/25/2000 | $20,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 11/8/2000 | $20,567.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATI ON FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 11/14/2000 | $20,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 11/20/2000 | $50,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 12/7/2000 | $50,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 12/22/2000 | $123,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 12/26/2000 | $12,000.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 1/16/2001 | $41,082.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 2/2/2001 | $33,500.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 3/8/2001 | $110,691.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 4/4/2001 | $31,619.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |

| 4/23/2001 | $4,139.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
|---|---|---|---|
| 5/9/2001 | $31,225.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 6/14/2001 | $32,871.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |
| 9/7/2001 | $30,285.00 | HOLYLAND FOUNDATION GENERAL | SANABIL ASSOCIATION FOR RELIEF AND DEVELOPMENT SIDON LEBANON |

600.    For example, on October 22, 1999, HLF transferred $40,000 to Sanabil's account # 12-02-44037-728529-1 at Defendant BLOM BANK using BLOM BANK's correspondent account at Bank of New York. *See* **Exhibit A.**

601.    On October 25, 2000, HLF transferred $20,000 to Sanabil's account # 12-02-44037-728529-1 at Defendant BLOM BANK using BLOM BANK's correspondent account at Citibank. *Se*e **Exhibit B.**

602.    On October 19, 2000, HLF transferred $31,254 to Sanabil's account # 12-02-44037-728529-1 at Defendant BLOM BANK using BLOM BANK's correspondent account at Northern Trust International Banking and American Express Bank in New York. *See* **Exhibit C.**

603.    As described below, KindHearts succeeded to HLF's fundraising for HAMAS after HLF was designated in December 2001. KindHearts sent an additional $250,000 to Sanabil's accounts between July 2002 and July 2003. Even after HLF's designation and the public outcry about its support for HAMAS, BLOM BANK continued to maintain Sanabil's account # 12-02-44037-728529-1 and process U.S. dollar-denominated transfers for KindHearts into the same account into which it had deposited HLF's funds.

604.    The Al-Aqsa Foundation transferred *at least* $50,000 into Sanabil's accounts at

Defendant BLOM BANK between April – May 2003, using BLOM BANK's correspondent account at the Bank of New York. *See* **Exhibit D.**

605.    Significantly, the second Al-Aqsa Foundation transfer in **Exhibit D** was sent to BLOM BANK even though Al-Aqsa Foundation had been designated by the U.S. Treasury on May 23, 2003.

606.    Between 1999 and 2003, Defendant BLOM BANK also processed fund transfers though its New York correspondent banks for CBSP and Interpal in amounts estimated to exceed $1 million.

607.    During this time period Sanabil served as Interpal's "official" representative in Lebanon.

608.    The U.S. government identified Sanabil as an unindicted co-conspirator in the HLF prosecution, calling it a "part of the Global HAMAS financing mechanism."

609.    In 2003, following a ruling from the Lebanese judiciary, the Sanabil organization center in the town of Sidon closed. Its closure – attributed to its links to HAMAS – was reported in the Lebanese press.

610.    For example, an August 27, 2004 article in *The Daily Star* in Lebanon reported that Sanabil "had sponsored 1,200 Palestinian families and spent around $800,000 on orphans and $55,000 on needy patients[.]" The same article reported that "[f]rom 1997-2000, Al-Sanabil's annual budget grew to $700,000, according to Al-Sanabil's former officials."

611.    Records seized from HLF show that Sanabil regularly distributed small sums in cash from its accounts to hundreds (if not thousands) of individual dependents in the Palestinian refugee camps under the categories of "Orphan Sponsorships," "Student Sponsorships," "Needy Sponsorships" and "Family Sponsorships."

612.    The beneficiaries were provided "membership ID numbers" and paid small amounts individually in a manner of an old-style political machine, buying loyalty in periodic stipends of $40-50 per quarter.

613.    Defendant BLOM BANK therefore not only facilitated large infusions of funds from prominent HAMAS fundraising organizations around the world; it also facilitated thousands of small cash disbursements that helped HAMAS purchase support in its target areas.

614.    After Sanabil closed, a Non-Governmental Organization called KindHearts began working secretly and independently in the camps in Lebanon, attempting to maintain a public distance from HAMAS to avoid drawing attention to its affiliation with the terrorist organization. According to the U.S. Treasury Department:

> Between July and December 2002, KindHearts sent more than $100,000 USD to the Lebanon-based SDGT Sanabil, according to information available to the U.S. Financial investigation revealed that between February 2003 and July 2003, KindHearts transferred over $150,000 USD to Sanabil. KindHearts deposited the funds into the same account used by HLF when it was providing funds to the HAMAS-affiliated Sanabil, according to FBI analysis.

615.    Just as KindHearts stepped into the shoes of Sanabil in Sidon when Sanabil closed in 2003, KindHearts took over HLF's fundraising for HAMAS after HLF was designated in December 2001. KindHearts was founded in January 2002 and incorporated as a non-profit in Toledo, Ohio. Mohammed El-Mezain, HAMAS's leader in the United States, was brought in as a fundraising specialist. El-Mezain had previously worked as a fundraiser for HLF.

616.    Omar Shahin was the Arizona representative of HLF and later of KindHearts.

617.    Once incorporated as a charitable organization, KindHearts quickly raised $2.9 million in 2002, $3.9 million in 2003, and $5 million in 2004. According to the Treasury Department, during a September 2003 fundraising event, Osama Hamdan, HAMAS leader in Lebanon at the time, called a KindHearts official to thank him for KindHeart's support. During

the fundraiser, one of the speakers urged support for HAMAS and Hezbollah.

618.    According to the U.S. Department of the Treasury, KindHearts sent $250,000 to Sanabil between July 2002 and July 2003.

619.    KindHeart's assets were frozen by the Treasury Department on February 19, 2006.

620.    KindHearts board chair Dr. Hatem Elhady told the *Toledo Blade*, that "[w]e did not just give money. We gave it for specific projects, and we saw the results, and we have the receipts."

**B.    Subul Al-Khair**

621.    Subul al-Khair is a small HAMAS institution founded in Beirut, Lebanon in 1998.

622.    Subul al-Khair was identified as an unindicted co-conspirator in HLF's criminal trial.

623.    Defendant BLOM BANK maintained an account for Subul al-Khair at its Rawsheh branch in Beirut (Account No. 0227534) and deposited multiple transfers sent by HLF to Subul al-Khair.

624.    Ostensibly, Subul al-Khair functioned much like Sanabil, but was more focused on HAMAS supporters in the Beirut area.

625.    Records seized from HLF show that HLF sent Subul al-Khair over $500,000 between 1999 and 2001.

626.    Subul al-Khair regularly distributed small sums in cash from its accounts to individual under the categories of "Orphan Sponsorships" and "Student Sponsorships."

627.    The beneficiaries were provided "membership ID numbers" and paid small amounts individually in a manner of an old-style political machine, buying loyalty in periodic stipends of $30-40 per quarter.

628.    Defendant BLOM BANK therefore not only facilitated large infusions of funds

from prominent HAMAS fundraising organizations through Subul al-Khair; it also facilitated vast numbers of small cash disbursements that helped HAMAS purchase support in its target areas.

### C.    "Union Of Good"

629.    The Union of Good (also known as the Charity Coalition or *I'tilaf Al-Khayr* in Arabic) was established in October 2000, at the beginning of the Second Intifada, as the umbrella organization for HAMAS's global fundraising activity.

630.    Comprising more than 50 separate organizations – several of which have been designated SDGTs by the U.S. Treasury Department, including Interpal and CBSP (two major HAMAS fundraising organizations in Europe) – the Union of Good originally began as a limited 101-day fundraising drive for emergency aid at the outset of what was later called the Second Intifada, chaired by Sheikh Yusuf al-Qaradawi, the Muslim Brotherhood's spiritual leader. According to Al-Qaradawi, "[t]he martyr operations [sic] is the greatest of all sorts of Jihad in the Cause of Allah."

631.    Sheikh al- Qaradawi issued a Muslim religious edict (*fatwa*) that gave HAMAS and other terrorist groups religious approval authorizing suicide bombing attacks (including by women) against Israel.

632.    In a July 7, 2004 interview for BBC's "Newsnight," al-Qaradawi, referring to the suicide attacks, said: "I consider this type of martyrdom operation as an evidence of God's justice."

633.    The 101-day fundraising drive was so successful that the Union of Good was converted into a permanent institution. It quickly became the preeminent Muslim Brotherhood fundraising mechanism in the world, raising tens of millions of dollars for HAMAS.

634.    On February 25, 2002, the Union of Good was designated by Israel in an order of the Minister of Defense of the State of Israel, based on its being "part of the Hamas organization or supporting it and strengthening its infrastructure."

635.    The Union of Good was designated by the U.S. Treasury Department as an SDGT

on November 12, 2008. According to the Treasury Department:

> Union of Good acts as a broker for HAMAS by facilitating financial
> transfers between a web of charitable organizations—including several
> organizations previously designated under E.O. 13224 for providing
> support to HAMAS—and HAMAS-controlled organizations in the West
> Bank and Gaza. The primary purpose of this activity is to strengthen
> HAMAS' political and military position in the West Bank and Gaza,
> including by: (i) diverting charitable donations to support HAMAS
> members and the families of terrorist operatives; and (ii) dispensing social
> welfare and other charitable services on behalf of HAMAS.
>
> Funds raised by the Union of Good affiliates have been transferred to
> HAMAS-managed organizations in the West Bank and Gaza. In addition to
> providing cover for HAMAS financial transfers, some of the funds
> transferred by the Union of Good have compensated HAMAS terrorists by
> providing payments to the families of suicide bombers. One of them, the
> Al-Salah Society, previously identified as a key support node for HAMAS,
> was designated in August 2007 under E.O. 13224. The Society employed a
> number of members of the HAMAS military wing and supported HAMAS-
> affiliated combatants during the first Intifada.

636.    Significantly, Al-Qaradawi is neither an obscure or shadowy figure. On the

contrary, he had his own weekly long-running television program on Al-Jazeera and has very

publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against

Israel.

637.    In fact, on April 14, 2002, al-Qaradawi appeared on Al-Jazeera extolling "jihad and

martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist

organizations.

638.    HAMAS often relies on Al-Qaradawi's legal rulings in matters of current import

and often turns to him to obtain legal rulings, which are published from time to time in HAMAS's

official newspapers (such as *Filastin al-Muslima*).

639.    HAMAS leaders have also served openly in the Union of Good's executive

leadership. For example, the Secretary General of the Union of Good, Essam Salih Mustafa

Yussuf, also acted as the Vice-Chairman of Interpal while serving on the HAMAS executive committee under then-HAMAS leader Khalid Mishal.

640.    The Union of Good maintained account no. 349647 at one of Defendant BLOM BANK's branches located on the prestigious Verdun Street in Beirut.

## CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING HAMAS, A DEISGNATED FOREIGN TERRORIST ORGANIZATION

641.    Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

642.    Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331 that were committed, planned and authorized by HAMAS, a designated FTO at the time each act of terrorism described occurred.

643.    BLOM BANK provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS and its operatives and maintaining bank accounts for its key institutions in Lebanon.

644.    BLOM BANK was fully aware of HAMAS's conduct, including its campaign of suicide bombings and other terrorist acts.

491.    BLOM BANK understood the value and importance to HAMAS of its own role in facilitating large transfers of funds, including the cross-border transfer of U.S. dollars, from donors and co-conspirators around the world to Lebanon and making those funds easily available to HAMAS.

645.    Plaintiffs allege that BLOM BANK knowingly aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest

possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), §2b.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

(a)   Accept jurisdiction over this action;

(b)   Enter judgment against Defendant and in favor of plaintiffs for compensatory damages in amounts to be determined at trial;

(c)   Enter judgment against Defendant and in favor of plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)   Enter judgment against Defendant and in favor of plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)   Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 1, 2019

By: /s/ Gerard Filitti
**OSEN LLC**
Gerard Filitti, Esq.
Michael Radine, Esq.
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
Telephone (201) 265-6400

1441 Broadway, Suite 6022
New York, NY 10018
Telephone (212) 354-0111

**ZUCKERMAN SPAEDER LLP**
Shawn P. Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
Telephone (646) 746-8655

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Telephone (501) 791-2277

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard, Esq.
Stephen H. Schwartz, Esq.
Neil L. Glazer, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone (215) 238-1700

Attorneys for Plaintiffs