UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

MICHAL HONICKMAN FOR THE ESTATE OF    :
HOWARD GOLDSTEIN, *et al.*,    :
   :
       Plaintiffs,    :
   :    No. 19-cv-00008-KAM-SMG
    -against-    :
   :
   :
BLOM BANK SAL,    :
   :
       Defendant.    :

-----------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
BLOM BANK SAL'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    HAMAS's Fundraising Apparatus .................................................................................. 3

    Defendant BLOM Bank Customer: Sanabil ................................................................... 4

    Defendant BLOM Bank Customer: Subul al-Khair ....................................................... 6

    Defendant BLOM Bank Customer: Union of Good ....................................................... 7

ARGUMENT ...................................................................................................................... 8

I.  PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d) ..... 8

    A.  *Halberstam* Provides the Proper Legal Framework for Civil Liability Under 18
        U.S.C. § 2333(d)(2). ................................................................................................. 8

    B.  Plaintiffs Have Sufficiently Alleged That BLOM Was Generally Aware of Its Role in
        HAMAS's Overall Illegal and Tortious Activity ...................................................... 10

        1.    The Scienter Required for Civil Liability Under 18 U.S.C. § 2333(d)(2). ........... 10

        2.    The Complaint Plausibly Alleges That BLOM Was Generally Aware of Its Role
            in HAMAS's Terrorist Activities. ................................................................... 17

        3.    The Factors Halberstam Identified Support an Inference of General
            Awareness. ................................................................................................. 21

    C.  Plaintiffs Plausibly Allege That BLOM Provided Substantial Assistance to
        HAMAS. .................................................................................................................. 22

II.  BLOM'S CHALLENGES TO SPECIFIC PLAINTIFFS' STANDING ARE
MERITLESS. .................................................................................................................... 28

    A.  The Steinherz Family's Injuries Were a Reasonably Foreseeable Consequence of
        Their Attack. ........................................................................................................... 28

    B.  Plaintiff Matanya Nathansen Has Standing to Bring Claims on Behalf of His
        Murdered Three-Year Old Daughter. ...................................................................... 29

    CONCLUSION ................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ........................................................................ 19, 27

*Crosby v. Twitter, Inc.*,
  303 F. Supp. 3d 564 (E.D. Mich. 2018) .................................................... 13, 15, 16

*Crosby v. Twitter, Inc.*,
  921 F.3d 617 (6th Cir. 2019) ................................................................... 13, 15, 29

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................................................ 27

*Goldberg v. UBS AG*,
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................ 17

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .............................................................. *passim*

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ............................................................................... 12, 24, 26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ............................................................................ 17

*In re Farm Family Casualty Ins. Co. (Trapani)*,
  753 N.Y.S.2d 198 (N.Y. App. Div. 2003) ........................................................... 29

*In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*,
  113 F.3d 1484 (8th Cir. 1997) ......................................................................... 21

*In re Terrorist Attacks on September 11, 2011*,
  714 F.3d 118 (2d Cir. 2013)............................................................................ 27

*Lelchook v. Islamic Republic of Iran*,
  No. 16-CV-07078, 2019 WL 2647998 (E.D.N.Y. June 27, 2019) .................... 1, 10

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003)............................................................................ 12

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................................ 22

*Linde v. Arab Bank, PLC,*
  97 F. Supp. 3d 287 (E.D.N.Y. 2015) ............................................................ 20, 23, 27

*Miller v. Arab Bank, PLC,*
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ................................................................... 1, 11

*Oveissi v. Islamic Republic of Iran,*
  768 F. Supp. 2d 16 (D.D.C. 2011) .............................................................................. 30

*Siegel v. HSBC Bank USA, N.A.,*
  No. 17-cv-6593 (DLC), 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ............................ *passim*

*Strauss v. Crédit Lyonnais, S.A.,*
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................. 12, 23

*Strauss v. Crédit Lyonnais, S.A.,*
  No. 06-cv-702(DLI)(RML), 2019 WL 1492902 (E.D.N.Y. Mar. 31, 2019).......................... 17

*Taamneh v. Twitter, Inc.,*
  343 F. Supp. 3d 904 (N.D. Cal. 2018) ......................................................... 13, 15, 16

*Thuneibat v. Syrian Arab Republic,*
  167 F. Supp. 3d 22 (D.D.C. 2016) .............................................................................. 30

*United States v. El-Mezain,*
  664 F.3d 467 (5th Cir. 2011) ....................................................................................... 20

*United States v. Hernandez-Orellana,*
  539 F.3d 994 (9th Cir. 2008) ....................................................................................... 16

*Weiss v. Nat'l Westminster Bank PLC,*
  No. 05-cv-4622 (DLI)(RML), 2019 WL 1441118, (E.D.N.Y. Mar. 31, 2019) ...................... 17

*Weiss v. Nat'l Westminster Bank PLC,*
  278 F. Supp. 3d 636 (E.D.N.Y. 2017) .......................................................... 12, 17, 27

*Weiss v. Nat'l Westminster Bank PLC,*
  768 F.3d 202 (2d Cir. 2014).................................................................................... 11, 23

*Weiss v. Nat'l Westminster Bank PLC,*
  453 F. Supp. 2d 609 (E.D.N.Y. 2006) .......................................................... 19, 22

**<u>Statutes</u>**

1 U.S.C. § 1 .................................................................................................... 26

18 U.S.C. § 2333(d) ................................................................................ *passim*

18 U.S.C. § 2339A(b)(1) ................................................................................ 24

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222 (2016) ..................... 1, 9, 24, 26

## INTRODUCTION

Plaintiffs are (a) United States citizens injured in terrorist attacks (the "Attacks") committed in Israel between 2000 and 2003, and their family members, and (b) the family members and estates of U.S. citizens killed in the Attacks. The Complaint alleges the Attacks were perpetrated by the designated Foreign Terrorist Organization ("FTO") HAMAS during a period of near-daily terrorism commonly referred to as the "Second Intifada." In order to carry out this multi-year terror campaign against innocent civilians, HAMAS required a steady infusion of U.S. dollars, which it obtained largely via a network of fundraising institutions (self-described "charities"), including its European fundraising network. A significant portion of that money flowed through HAMAS's networks in Lebanon, where it maintained a significant and well-known presence. Defendant BLOM Bank Sal ("BLOM") was HAMAS's banker in Lebanon, and it directed millions of dollars from HAMAS fundraising institutions abroad to the terrorist organization.

Plaintiffs therefore allege that BLOM is responsible for aiding and abetting HAMAS in committing the Attacks under 18 U.S.C. § 2333(d), added to the Anti-Terrorism Act ("ATA") in 2016 through the Justice Against Sponsors of Terrorism Act ("JASTA"). As BLOM points out, Plaintiffs here (and other similarly situated plaintiffs) have sued other financial institutions and entities for their respective roles in causing most of the Attacks. However, BLOM omits that courts and juries have consistently found as triable or proven facts that (1) those financial institutions knew or were deliberately indifferent to the fact that they held accounts for HAMAS fundraisers designated as Specially Designated Global Terrorists ("SDGTs") (and that they knew that even *before* those institutions were so designated), (2) the support those financial institutions provided to HAMAS proximately caused those plaintiffs' injuries, and (3) such conduct raises cognizable JASTA claims (most recently in *Miller* and *Lelchook*, *see infra* at 10-11).

In the face of the detailed pleadings and this prior precedent, BLOM's arguments consist of a series of alternative fallback positions: its customers were SDGTs, not FTOs, and therefore BLOM did not support HAMAS itself, BLOM's Mem. of Law ("Def. Mem.") at 8-9, 13-14; even if BLOM was aiding and abetting HAMAS, the support it provided only went to HAMAS's "charitable" purposes, *id.* at 14-16; even if BLOM knowingly aided and abetted HAMAS and HAMAS used the funding it received from BLOM for violent purposes, that support did not constitute a substantial and foreseeable cause of HAMAS's terrorist attacks on Plaintiffs, *id.* at 9-10, 21; even if BLOM's customers were alter-egos or controlled by HAMAS, BLOM did not know that at the relevant time, *id.* at 14-15; and finally, even if BLOM knew it was aiding and abetting HAMAS and providing it substantial assistance that foreseeably caused HAMAS's terrorist attacks on Plaintiffs, § 2333(d) requires that BLOM specifically aid and abet "the person" who committed the Attacks, and BLOM therefore cannot be held liable because the Complaint does not allege it aided and abetted the individual terrorist responsible for the Attacks, *id.* at 25. These arguments mix factual assertions and preferred evidentiary inferences that are – at best – appropriate for resolution by summary judgment or trial, with legal assertions that are incorrect. Faced with controlling caselaw and relevant jury findings that strongly suggest that Plaintiffs have adequately pled claims under § 2333(d) and that the Complaint's assertions are questions of fact, not law, BLOM relies on inapposite or out-of-circuit cases (that misstate or are at odds with the governing law in this Circuit), and urges the Court to draw unreasonable inferences from the evidence.

### STATEMENT OF FACTS

HAMAS is a terrorist organization committed to—according to its official charter—the establishment of an Islamic, Palestinian state in the entire territory of Israel through violent "jihad" (holy war). Compl. ¶ 508. At its founding, HAMAS was led by Ahmed Yassin (or "Sheikh

Yassin"). *Id.* ¶ 510. In the early 1990s, HAMAS sought to disrupt peace efforts between Israel and the Palestinians by: (1) upgrading its terror apparatus by perfecting its bomb-making skills and improving the capabilities of its military wing; (2) intensifying its efforts to systematically gain control of pre-existing "charitable" and other religious and social institutions to form HAMAS's *da'wa* network[1] to win the "hearts and minds" of the Palestinian public in Gaza, the West Bank and the Palestinian refugee camps in Jordan and Lebanon; and (3) accelerating the development of its world-wide fundraising network. *Id.* ¶¶ 522-25.

In 1994, HAMAS established BLOM's customer the Sanabil Association for Relief and Development ("Sanabil") in Lebanon. *Id.* ¶ 574. It also co-opted and used Subul al-Khair and the Islamic Welfare Association (Lebanon) – two similar *da'wa* institutions in Lebanon – to extend its reach into the Palestinian refugee camps where it was competing both with its long-time Palestinian nemesis, Fatah, and the growing power and appeal of Hezbollah. *Id.* ¶¶ 526, 576-585.

**HAMAS's Fundraising Apparatus**

HAMAS's fundraising activities became public knowledge soon after it was formed. In 1994, *The New York Times* reported:

> HAMAS funding of all its activities is estimated by the Israelis at about $30 million a year. It comes from money collected by associations operating largely abroad but with ties to the international Muslim Brotherhood network. Money is also collected from Islamic and Arab communities in the United States and . . . Western European locations.

*Id*. ¶ 528. A 2001 *Washington Post* article reported that, "[a]ccording to [Sheikh] Yassin, [HAMAS] distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; 'martyrs' who have been killed by Israelis; and prisoners in Israeli jails." *Id.* ¶ 530. Immediately after Israel launched its operation in southern Lebanon in 1996 to end

---

[1]      The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to HAMAS's civilian infrastructure.

Hezbollah's rocket attacks on Northern Israel, Sanabil distributed more than $100,000 to the inhabitants of the southern regions of Lebanon. *Id.* ¶ 575. Over time, Lebanon also became an important conduit for HAMAS funding of its operatives in the Palestinian Territories. *Id.* ¶ 587.

The outbreak of the Second Intifada in September 2000 was a key turning point in HAMAS's history. *Id.* ¶ 7. During the conflict, HAMAS launched hundreds of terrorist attacks targeting civilians that resulted in the deaths and injury of hundreds of civilians, including numerous American citizens. *Id.* ¶ 12. Also, during that period, the U.S. Treasury Department designated (as SDGTs) several HAMAS fundraising organizations that purported to be "charities," including Holy Land Foundation ("HLF") on December 4, 2001,[2] *id.* ¶¶ 567, 603, and Al-Aqsa Foundation on May 29, 2003, *id.* ¶ 553. On August 22, 2003, Treasury designated the Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), of France, the Palestinian Relief and Development Fund, or Interpal, headquartered in the United Kingdom, and Sanabil (along with others) as "part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS." *Id.* ¶¶ 543-45.

**Defendant BLOM Bank Customer: Sanabil**

BLOM's accountholder Sanabil was HAMAS's *da'wa* headquarters in Lebanon until late 2003. *Id.* ¶ 588. As Treasury explained in designating it on August 22, 2003:

> [Sanabil] receives large quantities of funds raised by major HAMAS-affiliated charities in Europe and the Middle East and, in turn, provides funding to HAMAS. For example, Sanabil has received funding from the Al Aqsa Foundation (designated as an SDGT under EO 13224 in May 2003); the Holy Land Foundation for Relief and Development (designated as an SDGT under EO 13224 in December 2001), and Interpal (designated as an SDGT under EO 13224 as part of this

---

[2]     As set forth in greater detail in the Complaint, HLF was a U.S.-based HAMAS fundraising entity that (in addition to five of its former directors) was convicted for transferring more than $12 million to HAMAS through various HAMAS-controlled committees and organizations located in Palestinian-controlled areas and Lebanon *after* HAMAS was designated. The convictions were upheld by the Fifth Circuit. *Id.* ¶¶ 560-69.

tranche). HAMAS recruits permanent members from the religious and the poor by extending charity to them from organizations such as Sanabil.

At the request of a HAMAS political leader, Sanabil began opening offices in all of the Palestinian refugee camps in Lebanon in August of 2001 in order to increase the foundation's role inside the camps. After starting by providing basic necessities the charity eventually began asking poor families within the camps to fill out application forms, particularly those who had worked with the Islamic Movement (Al-Haraka al-Islamiyya) and HAMAS. As a result of these efforts, Sanabil has increased its scope of influence within the camps.

*Id.* ¶ 590. In fact, between 1998 and 2001, Sanabil received millions of dollars in support from HAMAS's fundraising network and channeled those funds to the Palestinian refugee camps in Lebanon to build HAMAS's support within that community. *Id.* ¶¶ 596, 610-12.

Sanabil's board members were predominantly well-known HAMAS leaders in Lebanon. For example, Sanabil board member Ahmed Muhammad Abd al-Hadi was HAMAS's deputy representative and spokesman in Lebanon (and is currently HAMAS's senior leader in Lebanon). *Id.* ¶ 591. Abdallah Atawat, one of HAMAS's principal fundraisers in Lebanon, served as Sanabil's Deputy Chairman of the board of trustees and as a board member of the Welfare Association for Palestinian and Lebanese Families (subsequently designated an SDGT). *Id.* ¶ 592. Other members of HAMAS's leadership in Lebanon who served as trustees of Sanabil included Mashhur Abd al-Halim, who served as HAMAS's Palestinian relations representative in Lebanon, and Ziyad Qamr, a HAMAS political official. *Id.* ¶ 594.

During the relevant period, Sanabil held account no. 12-02-44037-728529-1 with BLOM. *Id.* ¶ 595. Between 1998 and 2001, HLF transferred over $2 million (U.S.) through BLOM's correspondent bank accounts in New York to Sanabil's BLOM account(s) in Lebanon. *Id.* ¶¶ 596-602.[3] After HLF's December 2001 designation, its successor organization KindHearts sent an

---

[3]     BLOM asserts that "Plaintiffs' own conduct reveals the insignificance of BLOM's alleged assistance," because the millions of dollars it transferred to HAMAS occurred 15 years ago but

additional $250,000 to Sanabil's accounts between July 2002 and July 2003. *Id.* ¶ 603. Between 1999 and 2003, BLOM also processed fund transfers though its New York correspondent banks from CBSP and Interpal to Sanabil in amounts estimated to exceed $1 million. *Id.* ¶ 606.  During this time period, Sanabil served as Interpal's "official" representative in Lebanon, and the U.S. government identified Sanabil as an unindicted co-conspirator in the HLF prosecution, calling it a "part of the Global HAMAS financing mechanism." *Id.* ¶¶ 607-08.

Records seized from HLF show that Sanabil regularly distributed small sums in cash from its accounts to hundreds (if not thousands) of individual dependents in the Palestinian refugee camps under the categories of "Orphan Sponsorships," "Student Sponsorships," "Needy Sponsorships" and "Family Sponsorships." *Id.* ¶ 611. The beneficiaries were provided "membership ID numbers" and were paid small amounts individually in the manner of an old-style political machine, buying loyalty in periodic stipends of $40-$50 per quarter. *Id.* ¶ 612. BLOM facilitated these "sponsorships," providing the mechanism through which HAMAS was able to purchase support in its target areas.

**Defendant BLOM Bank Customer: Subul al-Khair**

Subul al-Khair is a small HAMAS institution founded in Beirut, Lebanon in 1998 that was identified as an unindicted co-conspirator in HLF's criminal trial. *Id.* ¶¶ 621-22. BLOM maintained an account for Subul al-Khair at its Rawsheh branch in Beirut (no. 0227534) and deposited multiple transfers HLF sent to Subul al-Khair. *Id.* ¶ 623. Ostensibly, Subul al-Khair functioned in much the same way Sanabil did but was geographically focused on HAMAS

---

Plaintiffs did not sue BLOM earlier. Def. Mem. at 22. BLOM's logic is unclear, but this cause of action was brought subsequent to and under JASTA's 2016 enactment.

supporters in the Beirut area. Records seized from HLF show that HLF sent Subul al-Khair over $500,000 between 1999 and 2001. *Id.* ¶¶ 624-25.

**Defendant BLOM Bank Customer: Union of Good**

The Union of Good was established in October 2000 as the umbrella organization for HAMAS's global fundraising activity. *Id.* ¶ 629. It began as a 101-day fundraising drive for emergency aid at the outset of the Second Intifada, chaired by Sheikh Yusuf al-Qaradawi, the Muslim Brotherhood's spiritual leader and famous television personality in the Arab world. *Id.* ¶¶ 630-32; 636-38.[4] According to Al-Qaradawi, "martyr operations"—that is, suicide attacks—are "the greatest of all sorts of Jihad in the Cause of Allah." *Id.* ¶ 630. In sum, the Union of Good and its senior leadership were not clandestine, but open, well-known and prominent supporters of HAMAS and proponents of terror attacks on Israeli civilians.

On February 25, 2002, the Union of Good was designated by Israel as being "part of the Hamas organization or supporting it and strengthening its infrastructure." *Id.* ¶ 634. Treasury designated the Union of Good as an SDGT on November 12, 2008, finding:

> Union of Good acts as a broker for HAMAS by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to HAMAS—and HAMAS-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.

> Funds raised by the Union of Good affiliates have been transferred to HAMAS-managed organizations in the West Bank and Gaza. In addition to providing cover for HAMAS financial transfers, some of the funds transferred by the Union of Good have compensated HAMAS terrorists by providing payments to the families of suicide bombers. One of them, the Al-Salah Society, previously identified as a key

---

[4]     The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna and was dedicated to fighting Western influences on Muslim society. *Id.* ¶ 510 n.5.

> support node for HAMAS, was designated in August 2007 under E.O. 13224. The
> Society employed a number of members of the HAMAS military wing and
> supported HAMAS-affiliated combatants during the first Intifada.

*Id.* ¶ 635.

As with Sanabil, HAMAS leaders have also served openly in the Union of Good's executive leadership. For example, the Secretary General of the Union of Good, Essam Salih Mustafa Yussuf, also acted as Interpal's Vice-Chairman while serving on HAMAS's executive committee under then-HAMAS leader Khalid Mishal. *Id.* ¶ 639. The Union of Good maintained account no. 349647 at one of BLOM's branches in Beirut. *Id.* ¶ 640.[5]

## ARGUMENT

**I.    PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d).**

**A.  *Halberstam* Provides the Proper Legal Framework for Civil Liability Under 18 U.S.C. § 2333(d)(2).**

JASTA established that plaintiffs may assert statutory secondary liability for acts of international terrorism committed, planned, or authorized by a designated FTO against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). The JASTA amendment was explicitly added to *expand* the relief already available to civil litigants under 18 U.S.C. § 2333(a):

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found,

---

[5]    Without the benefit of discovery, Plaintiffs cannot assess the size and scope of the Union of Good's account activity at BLOM. However, given BLOM's well-documented support for HAMAS's other fundraising institutions and the importance of the Union of Good to HAMAS's fundraising network, it is not only plausible but likely that discovery will reveal that the account at BLOM was significant to HAMAS.

that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, § 2(b). *Accord Linde v. Arab Bank, PLC*, 882 F.3d 314, 328 (2d Cir. 2018) (describing JASTA as an "expansion" of the ATA).

JASTA directs courts to interpret aiding and abetting liability pursuant to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) (an appellate case reviewing a full trial record, not a motion to dismiss). *See also Linde*, 882 F.3d at 329 (same). In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam by her boyfriend, Bernard Welch, during a botched burglary. *See id.* at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488.

The *Halberstam* court set forth "the elements of traditional tort theory that permit holding a nonparticipant in a burglary that led to murder civilly responsible for the economic consequences of so terrible an injury." 705 F.2d at 489. They are:

(1) the party the defendant aids must perform a wrongful act that causes an injury;

(2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and

(3) the defendant must knowingly and substantially assist the principal violation.

705 F.2d at 477. Plaintiffs have plausibly alleged each of these elements.[6]

**B. Plaintiffs Have Sufficiently Alleged That BLOM Was Generally Aware of Its Role in HAMAS's Overall Illegal and Tortious Activity.**

**1. The Scienter Required for Civil Liability Under 18 U.S.C. § 2333(d)(2).**

Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." *Id.* at 486, 488. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486. Thus, the court concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

*Linde*, following *Halberstam*, held that in the terrorism context, a bank can be found liable for aiding and abetting a terrorist organization if it was generally aware of "a 'role' in terrorist activities" performed by that organization. 882 F.3d at 329. Plaintiffs need *not* show "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for Hamas." *Id.* Two recent JASTA decisions from this District relating to terror financing echoed *Linde*'s holdings. *See Lelchook v. Islamic Republic of Iran,* No. 16-CV-07078, 2019 WL 2647998, *4 (E.D.N.Y. June 27, 2019) (finding Iranian Bank Saderat

---

[6]     Plaintiffs have plausibly alleged, and BLOM has not disputed, that HAMAS is an FTO and committed the Attacks. *See* Compl. ¶¶ 535-36 (designation of HAMAS during relevant period), 13, 76, 207, 240, 299, 318, 337-38, 390, 407, 413-14, 486, 491 (alleging that HAMAS committed the Attacks).

liable for aiding and abetting Iranian terror attacks); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019) (denying motion to dismiss claims that Jordanian Arab Bank aided and abetted HAMAS terror attacks). Neither court required a showing (or pleading) that the specific funds provided by the defendant be earmarked for terrorist attacks or traceable to such attacks.

Contrary to BLOM's assertion, "terrorist activities" in *Linde* does not refer to terrorist *attacks*, just as the "overall illegal or tortious activity" in *Halberstam* was "personal property crimes at night," *not* murder. *See, e.g. Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208-09 (2d Cir. 2014) (holding that, under § 2339B of the ATA, "engaging in terrorist activities" includes "solicit[ing] funds for Hamas"). Thus, as in *Halberstam* and *Linde*, Plaintiffs must plausibly allege that BLOM was "generally aware of [its] role" in "terrorist activities," from which terrorist *attacks* were a natural and foreseeable consequence. An equivalent formulation of the general awareness requirement articulated in *Halberstam* in this case would be:

| Defendant (Secondary Tortfeasor) | Form of Substantial Assistance | Principal Tortfeasor | Illicit Scheme of Which Defendant Must Be Generally Aware | Foreseeable Resulting Tort |
|---|---|---|---|---|
| Ms. Hamilton | Banking, Bookkeeping | Welch | Property crimes at night | Murder |
| BLOM Bank | Banking, financial services | HAMAS | Terrorist activities (including soliciting, collecting and transferring funds on behalf of an FTO) | Terrorist attacks |

Plaintiffs here alleged that BLOM was generally aware of its role in terrorist activities. As the Second Circuit appellate and district courts have found, terrorist attacks are a "natural and foreseeable consequence" of soliciting and transferring funds for FTOs. In fact, Plaintiffs here, in another action, already raised as a triable issue that their injuries were "reasonably *foreseeable* ... as a *natural consequence*" of U.K. bank National Westminster Plc's ("NatWest") role in

transferring Interpal's funds to HAMAS-controlled "charities." *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 640 (E.D.N.Y. 2017) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)) (emphasis added). *See also Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (finding the same for French bank Crédit Lyonnais's support for CBSP).

BLOM argues that "[m]erely providing services to a Foreign Terrorist Organization, even if those services rise to the level of 'material support' as defined by 18 U.S.C. § 2339B, does not itself meet the scienter requirement." Def. Mem. at 12. Defendant cites *Linde*, but *Linde* held only that Arab Bank's knowing provision of financial services to HAMAS did not, *as a matter of law*, satisfy the *Halberstam* elements where the jury was never instructed on them (JASTA was enacted two years after the *Linde* trial was held). Citing the Supreme Court in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010), *Linde* noted that a defendant could in certain circumstances violate § 2339B, "which requires only knowledge of the organization's connection to terrorism," without "awareness that one is playing a role in those activities." *Id.* at 329-30.[7] In sum, *Linde* provides a basis for a defendant to argue *at trial* that even if it knowingly provided material support to an FTO, it was – under the circumstances of that case – unaware of its role in the FTO's "role in a continuing criminal enterprise."

---

[7]    *Holder* provides an example. There, plaintiffs challenged the constitutionality of § 2339B as applied to "(1) train[ing] members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes"; (2) "engag[ing] in political advocacy on behalf of Kurds who live in Turkey"; and (3) "teach[ing] PKK members how to petition various representative bodies such as the United Nations for relief." 561 U.S. at 14-15 (citation omitted). A defendant might knowingly supply this kind of material support to an FTO without being generally aware of its role in terrorist activities (and without foreseeing such terrorist activities as a natural consequence of such support).

In support of its argument, BLOM cites an inapposite case rooted in *negligence* that sought to hold HSBC Bank USA liable for *negligently* providing financial services to *another* bank which was reputed to have links to "financing organizations associated with terrorism." *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593 (DLC), 2018 WL 3611967, at *2, *4 (S.D.N.Y. July 27, 2018). BLOM also cites two out-of-circuit cases brought under the ATA against Twitter and other social media providers whose language analyzing JASTA at least facially conflicts with *Linde*: *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018) and *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 580 (E.D. Mich. 2018), *aff'd*, 921 F.3d 617 (6th Cir. 2019). Whereas *Linde* held that JASTA did *not* require allegations that the defendant knew of the "specific attacks at issue" and does not require Plaintiffs to prove BLOM's "intent to participate in a criminal scheme," the cases BLOM relies upon did. Lastly, BLOM relies upon the recent dismissals of the *Strauss* case against Crédit Lyonnais and the *Weiss* case against NatWest. Each of these cases is addressed below.

 **a.** ***Siegel***

In *Siegel*, plaintiffs were injured in three suicide bombings in Jordan perpetrated by Al Qaeda and Al Qaeda in Iraq ("AQI") in 2005. They sued HSBC and its U.S. subsidiary ("HBUS") under the ATA for failing "to take reasonable steps to ensure that HBUS was not dealing with banks that may have links to or that facilitate terrorist financing. HBUS opened U.S. correspondent accounts for high risk affiliates without conducting due diligence, thereby facilitating transactions that hindered U.S. efforts to stop terrorists." *Siegel*, 2018 WL 3611967, at *1. Plaintiffs there claimed that HBUS provided correspondent banking services to Al Rajhi Bank ("ARB"), knowing "that ARB was associated with terrorist financing and that ARB provided accounts to clients linked with terrorism." *Id.*

Finding that the plaintiffs had failed to adequately plead their § 2333(d) claims, the court noted that the complaint:

does not allege any direct relationship with the terrorist organizations that were responsible for the November 9 Attack. It describes instead HSBC's direct relationship with another financial institution, ARB. It is ARB that is alleged to have provided banking services to the terrorist organizations. It accuses the defendants of *adopting slipshod banking practices, and operating with inadequate anti-money laundering controls*, but it does not adequately allege that the defendants were aiding the terrorist organizations that performed the November 9 Attack. For instance, it does not adequately allege that the defendants were even generally aware that the financial services they provided ARB were directly assisting those terrorist organizations, or even that the financial services they provided ARB substantially assisted the terrorist organizations in carrying out the November 9 Attack.

*Id.* at *4 (emphasis added).

*Siegel* correctly held that negligence is insufficient to satisfy "general awareness" under

§ 2333(d), but its concluding language is sufficiently imprecise as to invite BLOM's reliance here:

> Even if the TAC alleged that services the defendants provided to ARB directly supported AQI and al-Qaeda, which it does not, that would be insufficient. The TAC does not allege that the defendants were generally aware that they were playing a role in the November 9 Attack. As the Second Circuit has noted, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*."

*Id.* at *5 (quoting *Linde*, 882 F.3d at 329).

Had the plaintiffs adequately alleged that ARB *knowingly* supported AQI and Al Qaeda, that would have been sufficient at least at the pleading stage to also allege *ARB*'s (not the HSBC defendants') general awareness of its role in those terrorist groups' illicit scheme. The court's focus was understandably on the general awareness of the HSBC defendants, but to the extent its language can plausibly be interpreted to suggest that *Linde* required (at trial) a showing that a defendant had awareness of it role in a specific terrorist attack, that formulation is incorrect. Just as the defendant in *Halberstam* was unaware of the murder that gave rise to her liability, the Second Circuit in *Linde* explicitly stated that plaintiffs need *not* show that a bank "knew of the specific attacks at issue when it provided financial services for Hamas." 882 F.3d at 329.

14

**b.** *Crosby*

In *Crosby*, plaintiffs were victims and family members of deceased victims of the mass shooting at the Pulse Night Club in Orlando, Florida perpetrated by Omar Mateen on June 12, 2016. They sued Twitter, Google and Facebook, which allegedly provided social media platforms used by the FTO Islamic State of Iraq and Syria ("ISIS"), alleging that these platforms allowed Mateen to hear ISIS's messages via the Internet and become radicalized, thereby triggering their liability for the shooting. Because those plaintiffs appear not to have alleged that ISIS knew anything about the attack before it occurred and apparently conceded that Mateen never had contact with any agent or entity directly connected to ISIS, the district court focused on the defendants' general awareness of their role in aiding and abetting Mateen rather than their alleged assistance to ISIS. 303 F. Supp. 3d at 573. The Sixth Circuit affirmed, finding that the plaintiffs failed to adequately allege proximate cause. 921 F.3d 617, 625 ("Plaintiffs' only allegation that connects Mateen and Defendants is that, at some point before the Pulse Night Club shooting, Mateen viewed online content from ISIS and became 'self-radicalized.'"). It also found that the plaintiffs failed to satisfy § 2333(d)'s standing requirement because there were no plausible allegations that ISIS "committed, planned, or authorized" the Pulse Night Club attack. *Id.* at 626. The facts of that case are self-evidently divergent from those here, where HAMAS is alleged to have committed the Attacks, aided directly by BLOM. *See supra* at 10 n.6.

**c.** *Taamneh*

In *Taamneh,* American relatives of a Jordanian national killed in a terrorist attack in Istanbul sued Twitter, Google (as owner of YouTube), and Facebook, for providing material support to and aiding and abetting ISIS, because they "refused to actively monitor [their] online social media networks" and "generally only reviewed ISIS's use of [their] services in response to third party complaints. In some instances, even after being alerted, Defendants found that ISIS did

15

not violate their policies and allowed the ISIS-affiliated accounts to remain active." 343 F. Supp. 3d at 907 (internal citations omitted). The plaintiffs also claimed that the terrorist who perpetrated the attack was "radicalized by ISIS's use of social media." *Id.*

Setting aside that these allegations raise a very different issue with respect to proximate cause, *Taamneh* required allegations that the defendant directly aid and abet the individual terrorist and the attack itself, quoting the *Crosby* district court's requirement of allegations that defendants "aided or abetted the person (Mateen) who committed *the night club attack*,'" *id.* at 916 (quoting *Crosby*, 303 F. Supp. 3d at 573), and *Siegel*'s requirement that defendants "were generally aware that they were playing a role *in the November 9 Attack*," *id.* (quoting *Siegel*, 2018 WL 3611967, at *5). It further stated that "requiring secondary liability to be connected with a specific crime would be consistent with the common law's understanding of aiding and abetting," which included, *inter alia*, "that the accused had the specific intent to facilitate the commission of a crime by another, [and] that the accused had the requisite intent to commit the underlying substantive offense." *Id.* (quoting *United States v. Hernandez-Orellana*, 539 F.3d 994, 1006-07 (9th Cir. 2008), a *criminal* case). These findings conflict with *Linde*, which specifically held that general awareness does not require knowledge of specific attackers or attacks or "the specific intent demanded for criminal aiding and abetting culpability." 992 F.3d at 329. Thus, *Taamneh* facially conflicts with both *Halberstam* and *Linde*.

### d. *Weiss and Strauss*

Finally, BLOM relies on the recent dismissals of *Weiss* and *Strauss*, two cases where the district court found, on a trial-ready record, that two European banks could not have been generally aware of their respective roles in their designated SDGT customers' and HAMAS's continuing criminal enterprise because the customers had "ostensibly charitable purposes" and the plaintiffs failed to either (a) trace the banks' assistance either to HAMAS's specific attacks on the plaintiffs

or (b) establish that the HAMAS-controlled institutions that received the assistance *themselves*

perpetrated or otherwise participated in the attacks giving rise to the plaintiffs' claims. *See Strauss*

*v. Crédit Lyonnais, S.A.*, No. 06-cv-702(DLI)(RML), 2019 WL 1492902, *6-7 (E.D.N.Y. Mar. 31,

2019) (requiring a showing that "funds transferred by CBSP through Defendant accounts were

used to perpetrate the 15 attacks" at issue, or that transfers were "meant to involve a violent act or

an act dangerous to human life," or evidence that "the 13 Charities participated in, planned, trained

the perpetrators of, requested that someone carry out, or were the cause of the attacks giving rise

to Plaintiffs' claims."); *Weiss v. Nat'l Westminster Bank PLC*, No. 05-cv-4622 (DLI)(RML), 2019

WL 1441118, at *6 (E.D.N.Y. Mar. 31, 2019) (same). These decisions were erroneous, and the

"tracing requirement" they articulate is mistaken. As this District Court previously observed:

> Common sense requires a conclusion that Congress did not intend to limit recovery
> to those plaintiffs who could show that the *very dollars* sent to a terrorist
> organization were used to purchase the implements of violence that caused harm to
> the plaintiff. Such a burden would render the statute powerless to stop the flow of
> money to international terrorists, and would be incompatible with the legislative
> history of the ATA. *See, e.g.*, S.Rep. No. 102-342 at 22. ("Noting that Congress
> intended to impose 'liability at any point along the causal chain of terrorism.'").

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009). JASTA's stated purpose was to

*expand* ATA liability further. *See Linde*, 882 F.3d at 328 (describing JASTA as an "expansion" of

the ATA). *Weiss* and *Strauss* are under appeal; but in any event, they are the product of a full

evidentiary record and were not dismissed at the pleading stage.

### 2. The Complaint Plausibly Alleges That BLOM Was Generally Aware of Its Role in HAMAS's Terrorist Activities.

As in *Halberstam* and *Linde*, Plaintiffs must allege that BLOM was "generally aware of

[its] role" in "terrorist activities," from which terrorist *attacks* were a natural and foreseeable

consequence. Although courts are expected to be "lenient in allowing scienter issues …. to survive

motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir.

2009) (internal quotation marks and citation omitted), *see also Weiss*, 768 F.3d 202 at 211 (same),

the Complaint sets forth many specific allegations that provide a strong inference of BLOM's

awareness of its role in HAMAS's fundraising activities, including the central fact that it held

accounts for *three* HAMAS institutions during the relevant period: Sanabil, an SDGT; Subul al-

Khair; and the Union of Good, also an SDGT. As Ian Fleming famously wrote: "Once is

happenstance. Twice is coincidence. Three times is enemy action." *Goldfinger*, Ch. 14 (1959).

Here, the Complaint sets forth allegations whose most plausible inference is that BLOM was

generally aware of its role in assisting HAMAS and its criminal scheme:

- HAMAS maintained a substantial presence in Lebanon, Compl. ¶¶ 570-87;

- Sanabil's board members "were predominantly well-known HAMAS leaders in Lebanon," *id.* ¶¶ 591-94;

- Sanabil's BLOM account received large sums of incoming transfers from HAMAS fundraising organizations outside of Lebanon, *id.* ¶¶ 596-607;[8]

- Sanabil's BLOM account received large sums of incoming transfers from HLF, which was prominently designated an SDGT on December 4, 2001 (following the September 11, 2001 attacks and U.S. efforts to disrupt international terrorism financing), *id.* ¶¶ 596-602;

- Sanabil's BLOM account received funds transfers from the Al-Aqsa Foundation even *after* it was designated an SDGT on May 29, 2003, *id.* ¶ 605 (Exhibit D to the Complaint);[9]

---

[8]     Israel designated several of these HAMAS donor organizations *before* and during the relevant period, *id.* ¶ 539 (Israel declared CBSP an illegal organization on May 6, 1997 and designated it a terrorist organization on January 17, 1998), *id.* ¶¶ 541-42 (published reports in Israel linked Interpal to HAMAS as early as 1995; Israel declared Interpal an illegal organization on May 6, 1997 and designated it a terrorist organization on January 17, 1998), *id.* ¶¶ 550-52 (Israel declared the Al-Aqsa Foundation an illegal organization on May 6, 1997 and designated it a terrorist organization on January 19, 1998).

[9]     The U.S. designation explicitly stated that "Al Aqsa funnels money collected for charitable purposes to Hamas *terrorists,*" ¶ 554 (emphasis added), and that the "Al Aqsa Foundation is the 18th financier of terror disguised as a charitable organization designated by the Treasury Department." *See* May 29, 2003 Treasury Press Release, *available at*

- Sanabil used its BLOM account to regularly distribute small sums *in cash* from its accounts to hundreds (if not thousands) of HAMAS supporters in the nearby Lebanese refugee camps, *id.* ¶¶ 611-13;

- Prior to its SDGT designation, HLF also transferred over $500,000 to another HAMAS institution in Beirut known as Subul al-Khair, which also held an account at BLOM Bank, *id.* ¶¶ 621-28;

- BLOM maintained an account in Beirut for the Union of Good, the prominent fundraising umbrella for HAMAS which was designated by Israel in 2002 for being "part of the Hamas organization or supporting it and strengthening its infrastructure," *id.* ¶ 634;

- The public face of the Union of Good since its inception was Sheikh Yusuf al-Qaradawi, the Muslim Brotherhood's spiritual leader, *id.* ¶¶ 630-32. Al-Qaradawi is one of the most recognizable personalities and leaders in the Muslim world and a prominent proponent of *jihad* against Israel, *id.* ¶¶ 636-38; and

- "HAMAS leaders have also served openly in the Union of Good's executive leadership," *id.* ¶ 639.[10]

BLOM argues that because its three identified customers were not *themselves* designated FTOs it is not liable, an argument that courts have repeatedly rejected. *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 622-23 (E.D.N.Y. 2006) ("ordinary principles of agency law" determine whether an FTO's status as such extends to "juridically separate agents subject to its control") (internal citations omitted); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701-02 (7th Cir. 2008) (*en banc*) ("*Boim III*") (holding that providers of material support cannot "escape liability because terrorists and their supporters launder donations through

---

https://www.treasury.gov/press-center/press-releases/Pages/js439.aspx.

[10]   BLOM argues Plaintiffs failed, in their Complaint, to state their roles or when they assumed those roles. The Union of Good leaders in the Palestinian Territories during the relevant period were all HAMAS leaders. The U.S. Department of the Treasury designation cited in the Complaint, ¶ 635, notes that: "The leadership of Hamas created the Union of Good in late-2000, shortly after the start of the second Intifada, in order to facilitate the transfer of funds to Hamas" and goes on to state that "[t]he Union of Good's executive leadership and board of directors includes Hamas leaders, Specially Designated Global Terrorists (SDGTs), and other terrorist supporters." *See* https://www.treasury.gov/press-center/press-releases/Pages/hp1267.aspx.

a chain of intermediate organizations. . . . [T]o set the knowledge and causal requirement higher than we have done in this opinion would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare).").

In the alternative, BLOM argues that it believed these organizations' claims that they conducted "charitable and political activities, not violent ones." Def. Mem. at 15. For instance, BLOM argues, incredibly, that it could not have known that the money it moved for Al-Aqsa *after* it was designated an SDGT for being a "critical part of HAMAS' *terrorist* support infrastructure," Compl. ¶ 554 (emphasis added), was terrorism-related because it was "earmarked for 'HELP CONCERNING ORPHAN CHILDREN.'" Def. Mem. at 18.

Putting to the side the fact that terrorist fundraisers often claim they serve "charitable purposes,"[11] the Complaint notes that, from its inception in 2000, the Union of Good was closely identified with its famous chairman, Sheikh al-Qaradawi – known throughout the Muslim world for his public advocacy of *jihad* (including suicide bombings) against Israel. Compl. ¶¶ 630-32; 636-38.[12] The Complaint also details the vast sums BLOM deposited for Sanabil that originated

---

[11]     *See, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 485 (5th Cir. 2011) *as revised* (Dec. 27, 2011) ("HLF held itself out to be the largest Muslim charity in the United States, ostensibly with the mission of providing humanitarian assistance to needy Palestinians living in the Israeli-occupied territory of the West Bank and Gaza. The Government charged that in reality HLF's mission was to act as a fundraising arm for Hamas, also known as the Islamic Resistance Movement, and to assist Hamas's social wing in support of Hamas's goal to secure a Palestinian Islamic state in what is now Israel.").

[12]     In *Linde*, the trial court "admitted a video of Khaled Mash'al, a Hamas leader, and Sheik Yousef Al–Qaradawi speaking at a conference in which they discussed raising money for Hamas, supporting suicide bombings, and joking about how they were both terrorists. The video's primary relevance was to show the connection between the Union of Good, the charity led by Al–Qaradawi, and Hamas. Nevertheless, to the extent the truth of certain statements in the video was relevant—most notably statements that the Union of Good had raised tens of millions of dollars to support Hamas and the Intifada—the penal interests implicated were clear: Membership in Hamas and raising money for Hamas are crimes under United States and Israeli law." 97 F. Supp. 3d 287, 343 (E.D.N.Y. 2015).

with HLF. *Id.* ¶¶ 595-602. It further notes that Sanabil's "charitable" activities consisted of withdrawing large sums of cash from its account at BLOM and distributing it in target areas to purchase support for HAMAS. *Id.* ¶¶ 610-13.

Moreover, as the U.S. government actions against Sanabil, HLF, Al-Aqsa Foundation and the Union of Good all make clear, HAMAS uses "humanitarian[] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS." *Id.* ¶ 545. *See also id.* ¶ 566 ("evidence strongly suggests that the [HLF] has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement); ¶ 554 ("Al Aqsa is a critical part of HAMAS' terrorist support infrastructure."); ¶ 635 ("Union of Good acts as a broker for HAMAS …. The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.").

### 3.   The Factors Halberstam Identified Support an Inference of General Awareness.

Plaintiffs' allegations also support the factors that *Halberstam* identified as supporting an inference of general awareness: duration and substantiality of support, "unusual" assistance, and offensiveness of the act assisted.

*First*, the duration and substantiality of assistance are factors bearing on the accessorial defendant's general awareness of its role. 705 F.2d at 484, 488 ("the *duration of the assistance ...* affected our sense of how Hamilton perceived her role"). *See also In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997) ("[T]he stronger the evidence of substantial assistance, the less evidence of general awareness is required."). BLOM

assisted HAMAS for many years, encompassing the entire relevant period, including *after* its customers and its customers' counterparties were designated by the Israeli and United States governments for supporting terrorism.

*Second*, while the assistance itself need not be "nefarious" (Hamilton's services in *Halberstam* were in fact "neutral standing alone"), performing them "in an unusual way under unusual circumstances for a long period of time," is relevant to the accessorial defendant's state of mind. 705 F.2d at 482, 487-88. BLOM insists *ten times* in its brief that the services it provided to HAMAS were "routine." But knowingly providing banking services to an FTO is not "routine": "[G]iven plaintiff's allegations regarding the knowing and intentional nature of the Bank's activities there is nothing 'routine' about the services the Bank is alleged to provide." *Weiss*, 453 F. Supp. 2d at 625 (quoting *Linde v. Arab Bank*, 384 F. Supp. 2d 571, 587-88 (E.D.N.Y. 2005)). Moreover, the allegations here identify Sanabil as (a) a "charity" HAMAS established (b) that received millions of dollars in international donations (c) primarily from organizations designated by Israel, the United States and, in one case, European governments as well, that (d) distributed these funds in the form of small, cash payments. None of the foregoing can fairly be described as "routine." In any event, as the Second Circuit explained, whether "financial services to Hamas should not be viewed as routine . . . . raises questions of fact for a jury to decide." *Linde*, 882 F.3d at 327.

*Third, Halberstam* emphasized that "[t]he particularly offensive nature of an underlying offense might also factor in … the 'state of mind' of the defendant." 705 F.2d at 484 n.13 (including "the seriousness of the foreseeable consequences"). Terror financing and the resulting terrorist attacks are almost uniquely offensive. Therefore, when a defendant is aware of a risk that it is assisting an FTO (in this case through designated customers), applying *Halberstam*'s

"proportionality test to particularly bad or opprobrious acts," is particularly important. *Id.* The issue is for a jury to weigh.

### C. Plaintiffs Plausibly Allege That BLOM Provided Substantial Assistance to HAMAS.

Plaintiffs have plausibly alleged that BLOM "knowingly provid[ed] substantial assistance" to HAMAS during the relevant period. §2333(d)(2).[13] *Halberstam* identified six factors to assess substantiality: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Halberstam*, 705 F.2d at 483-84. The Second Circuit explained that "[d]isputed facts pertinent to these factors and the weight to assign such factors" are factual issues for the trier of fact and not matters that can be determined as a matter of law. *Linde*, 882 F.3d at 330.

***The Nature of the Act Assisted.*** The nature of the act involved "dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. Just as Hamilton's services were "indisputably important to th[e] laundering function" of her boyfriend's burglary enterprise, *id.* at 488, so too BLOM's financial services were vital to HAMAS's terror financing. As the Complaint makes clear, HAMAS directed millions of dollars that it collected internationally (including in the United States) through the U.S. financial system and was able to seamlessly transfer it to its operatives in Lebanon, where, with BLOM's assistance, those wire transfers were converted into cash and distributed to HAMAS constituents in Lebanon.

---

[13]     Although the "substantiality inquiry for causation is not identical to the substantiality inquiry for aiding and abetting," *Linde*, 882 F.3d at 330, the provision of financial services on behalf of Interpal and CBSP already withstood summary judgment in *Weiss*, 768 F.3d at 212, and *Strauss*, 925 F. Supp. 2d at 434, and a challenge to the jury verdict in *Linde*, 97 F. Supp. 3d at 334.

*Halberstam* found that "[a]lthough Hamilton's own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.*, a five-year-long burglary campaign against private homes." *Id.* at 488. Here, BLOM's facilitation of millions of dollars in international fundraising for HAMAS and conversion of those funds into cash for HAMAS to dispense to its supporters must be evaluated in the context of the enterprise they aided: HAMAS's terror financing and the foreseeable consequences of providing substantial, contemporaneous support to that terrorist organization.

Although BLOM asserts that it did not "donate[] money to the Alleged Account Holders," Def. Mem. at 21, JASTA requires no such allegation. *See Linde*, 882 F.3d at 327 (holding that a jury must decide whether "providing routine financial services"—or whether those services should even be "viewed as routine"—qualifies as acts of international terrorism). Financial services of the kind BLOM provided to HAMAS are crucial to moving large sums of money across borders, which is why 18 U.S.C. § 2339A(b)(1) explicitly criminalized "financial services" as a form of material support. JASTA's statutory purpose is to provide victims of terrorism a remedy against those who "have knowingly or recklessly provided material support or resources, directly or *indirectly*, to the persons or organizations responsible for their injuries." JASTA § 7 (emphasis added). *See also id.* § 6 ("directly or indirectly"). The Complaint alleges in detail *direct* material support BLOM provided to HAMAS and even attaches examples of that support.

***Amount of Assistance.*** The millions of dollars BLOM transferred to HAMAS-controlled charities, Compl. ¶¶ 6, 588, 596-606, 614, 618, 625, were "integral" to HAMAS's terrorist operations. *Halberstam*, 705 F.2d at 484. Further, the amount of assistance is "influence[d]" by the duration of the assistance provided." *Id.* at 488 (emphasis omitted). The *Halberstam* court noted that "although the amount of assistance Hamilton gave Welch may not have been

overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." *Id.* BLOM allegedly provided HAMAS those millions of dollars over several years during the Second Intifada. *See, e.g.*, Compl. ¶ 599.

 **Presence at the time of the tort.** In *Halberstam*, "Hamilton was admittedly not *present at the time* of the murder or even at the time of any burglary," but "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods, and Hamilton's role in that side of the business was substantial." *Id.* at 488. BLOM was also not "present at the scene" of HAMAS's terror attacks, but the U.S. government designations of HLF and the Al-Aqsa Foundation, as well as the designations of BLOM's customers, Sanabil and the Union of Good, strongly suggest that HAMAS's "tortious enterprise" substantially depended on the funds raised and distributed with BLOM's assistance.

 **State of Mind.** The *Halberstam* court held that "evidence as to the *state of mind* of the defendant may also be relevant to evaluating liability." 705 F.2d at 484. Specifically, the court found that both knowing assistance and continuous participation evidence "a deliberate long-term intention to participate in an ongoing illicit enterprise," as opposed to a "passing fancy or impetuous act." 705 F.2d at 488. BLOM's knowing provision of financial services to HAMAS customers throughout the Second Intifada was no "passing fancy." *See* Compl. ¶¶ 595, 623, 640.

 BLOM, on the other hand, argues that "a defendant is liable for aiding and abetting only if it *directly* aided and abetted the '*person*' who committed the relevant '*act* of international terrorism.'" Def. Mem. at 24. BLOM then points out that Plaintiffs did not allege a "direct relationship between BLOM" and the "15 individual terrorists operatives" who carried out the attacks (or even name them). *Id.* at 25. Section 2333(d)(1), however, contains no such requirement or any textual basis for the argument. Setting aside JASTA's stated statutory purpose to provide

victims of terrorism a remedy against those who "have knowingly or recklessly provided material support or resources, directly or *indirectly*, to the persons or organizations responsible for their injuries," JASTA § 7 (emphasis added), § 2333(d)'s text explicitly defines the word "person" as having "the meaning given the term in section 1 of title 1." That definition "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*," 1 U.S.C. § 1 (emphasis added). If § 2333(d) only applies to aiding and abetting individual terrorists, § 1's definition is superfluous. Moreover, no one has ever been physically attacked by a corporation or joint stock company. Hence, the Second Circuit in *Linde* did not dismiss plaintiffs' § 2333(d) claims against Arab Bank due to insufficient evidence that the defendant aided and abetted each suicide bomber. 882 F.3d at 331.

Further, BLOM's view would require tracing its transactions on behalf of the HAMAS-controlled institutions directly to each attack. This argument has been repeatedly rejected, as any support to an FTO supports the terrorist attacks it commits: "Congress and the Executive . . . have concluded that . . . designated foreign terrorist organizations 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Holder*, 561 U.S. at 38 (quoting 18 U.S.C. § 2339B note). The Supreme Court has explained why that is the case:

> Money is fungible, and when foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.

*Id.* at 31 (internal citations omitted) (relying on Executive and Congressional findings that are entitled to "deference" and "significant weight"). *Id.* at 33, 36.

Other district court decisions in this Circuit have agreed. *See, e.g.*, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) ("A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets."); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015), *vac'd on other grounds*, 882 F.3d 314 (2d Cir. 2018) (adopting Judge Gershon's prior ruling that "rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks"). Moreover, *Linde* and *Boim III* involved material support for related HAMAS "charities" (and, in *Linde*, the same attacks), but did not articulate any requirement that these HAMAS-controlled institutions *themselves* specifically participated in the attacks at issue. In *Boim III*, the Seventh Circuit held *en banc* that "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's non-terrorist activities does not get you off the liability hook," both because money is fungible and because "Hamas's social welfare activities reinforce its terrorist activities." 549 F.3d at 698. *See also Weiss*, 278 F. Supp. 3d at 643 (same).

Finally, BLOM's reliance on *Siegel* and *Crosby* is again misplaced. The Second Circuit first addressed allegations against al-Rajhi Bank brought under § 2333(a) in *In re Terrorist Attacks on September 11, 2011* ("*Al Rajhi*"), 714 F.3d 118, 124 (2d Cir. 2013) (allegations that bank maintained accounts for an Al Qaeda fundraising organization (later designated an SDGT) insufficient to plead proximate cause where organization itself was not alleged to be an alter ego of Al Qaeda and complaint did not contain any specific allegation that defendant's account for organization were used to transmit funds to Al Qaeda). In *Siegel*, the plaintiffs pled a causal relationship at least one *further* step removed from the allegations in *Al Rajhi,* seeking to hold one of Al Rajhi's U.S. correspondent banks (HBUS) liable under the ATA for negligently maintaining

an account for Al Rajhi Bank itself on the theory that Al Rajhi had been credibly accused of supporting terrorist organizations and, nevertheless, HBUS provided it with correspondent banking services. Setting aside the fact that the ATA does not recognize claims predicated on negligence, *Siegel*'s allegations stand in stark contrast to those set forth in the Complaint here, which explicitly alleges that BLOM knowingly transferred funds from HAMAS fundraisers to its own customers (at least one of which – Sanabil – is alleged to have been a HAMAS alter ego), which *exclusively* provided funding to HAMAS. Compl. ¶¶ 588, 623-24, 635-40.

BLOM's reliance on *Crosby* fares no better. As detailed above, in *Crosby*, the plaintiffs failed to allege that the terrorist who injured them had any pre-existing connection to ISIS, the terrorist group using defendant Twitter's social media platform. Here, the sufficiency of Plaintiffs' allegations setting forth HAMAS's responsibility for the Attacks is not disputed, the relationship between BLOM's customers and HAMAS has been detailed by the U.S. government in multiple official designations and criminal prosecutions, and bank records establishing BLOM's financial services on behalf of multiple HAMAS fundraising SDGTs are attached as exhibits to the Complaint.

## II.   BLOM'S CHALLENGES TO SPECIFIC PLAINTIFFS' STANDING ARE MERITLESS.

### A. The Steinherz Family's Injuries Were a Reasonably Foreseeable Consequence of Their Attack.

BLOM contends that the claims of Plaintiffs Altea and Jonathan Steinherz and their family members should be dismissed, characterizing the circumstances of their physical and emotional injuries as "easily an intervening cause that broke the chain of causation." Def. Mem. at 26 (internal citations omitted).[14] On the contrary, these injuries, suffered when Ms. Steinherz was nine

---

[14]     In their May 3, 2019 letter to the Court requesting a pre-motion conference, BLOM referred to the circumstances of the Steinherzs' injuries as a "slip-and-fall." ECF No. 20 at 3.

months pregnant and attempting to flee with her husband from the site of the December 1, 2001 Ben Yehuda Street bombings (a coordinated double-suicide bombing and car bombing at a pedestrian mall), Compl. ¶¶ 413-14, 465-85, were "reasonably foreseeable consequence[s]" of the attack. *Halberstam*, 705 F.2d at 487. The facts in *Crosby*, cited by BLOM in support of its argument, prompted the court there to comment that "a butterfly in China is not the proximate cause of New York storms," and hold that a public social media platform used by ISIS was not liable for an attack perpetrated by a lone gunman with no connection to ISIS that watched ISIS content. 921 F.3d 617, 623, 624-25. But the Steinherzs' injuries were sustained while fleeing from nearby suicide bombings and a coordinated car bomb designed to target first responders.[15] They and every other person in the vicinity, whether they were killed or injured in the blast or simply witnessed the carnage, were within the zone of intended and foreseeable harm. *See, e.g., In re Farm Family Casualty Ins. Co. (Trapani)*, 753 N.Y.S.2d 198, 200 (N.Y. App. Div. 2003) (permitting individual injured during a fall she incurred while running away from sparks raining down on her from a powerline that was struck by a vehicle to recover from the vehicle owner's motorist insurance policy). Not only were the three coordinated bombings not "so remote in either time or space from [Plaintiffs'] injuries," *id.*, their very purpose was to sow fear and panic not only in bystanders in or near the blast zone but also in the wider public as well. Thus, the Steinherz family's claims should not be dismissed.

### B. Plaintiff Matanya Nathansen Has Standing to Bring Claims on Behalf of His Murdered Three-Year-Old Daughter.

As the Plaintiffs apprised this Court in their letter dated May 22, 2019, ECF No. 26, they

---

[15]     BLOM states that the Steinherz plaintiffs "do not allege they were at the Ben Yehuda Street bomb site, but rather, at a 'nearby' restaurant." Def. Mem. at 26. Ben Yehuda Street is an outdoor pedestrian mall. Victims situated at the "bomb sites" did not survive the blasts. The Steinherz family members were among the hundreds of patrons walking, shopping or dining in the targeted area.

are not voluntarily dismissing the claims of Plaintiff Matanya Nathansen, the father of Tehilla Nathansen, a three-year old U.S. citizen murdered in a suicide bombing on August 19, 2003 while sitting on her mother's lap aboard a bus. Compl. ¶¶ 76-77, 132-39. Mr. Nathansen indisputably has standing to bring an action under § 2333(a). BLOM therefore appears to be challenging his right to pursue a higher measure of damages predicated on the totality of the circumstances of the attack, which include his own physical injuries and the serious injuries sustained by his wife and surviving daughters. In reviewing solatium claims in Foreign Sovereign Immunity Act ("FSIA") Terrorism Exception cases, courts have taken a holistic approach:

> Solatium, as an award for "injury to feelings," is difficult to articulate in mathematical or numerical terms. A court's job in a solatium case is to account for various facts and circumstances, and to use those factors to arrive at an appropriate numerical expression of total pain and grief—encapsulated in the solatium award.

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (citations omitted). In *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 51-52 (D.D.C. 2016), one of the family member plaintiffs recovered for witnessing the *aftermath* of an attack, not the attack itself: "She was not in the ballroom where the suicide bomber detonated his bomb belt, but stood right outside where she witnessed her uncle die in front of her," and "she saw her own daughter carried out of the ballroom into an ambulance and multiple dead and injured bodies of many of her relatives in attendance at the family wedding." *Id.* In sum, whatever basis BLOM may assert to later seek to exclude certain evidence at trial, its objections at the motion to dismiss stage to the Complaint's description of Mr. Nathansen's injuries are misplaced.

## CONCLUSION

For the reasons set forth herein, BLOM Bank's motion to dismiss should be denied in its entirety.

Dated: July 8, 2019
  Hackensack, NJ

        By:  /s/ Gary M. Osen

           **OSEN LLC**
           Gary M. Osen, Esq.
           Ari Ungar, Esq.
           Michael J. Radine, Esq.
           Dina Gielchinsky, Esq.
           2 University Plaza, Suite 402
           Hackensack, NJ 07601
           Telephone (201) 265-6400

           **ZUCKERMAN SPAEDER LLP**
           Shawn P. Naunton, Esq.
           485 Madison Avenue, 10th Floor
           New York, NY 10022
           Telephone (646) 746-8655

           **TURNER & ASSOCIATES, P.A.**
           C. Tab Turner, Esq.
           4705 Somers Avenue, Suite 100
           North Little Rock, AR 72116
           Telephone (501) 791-2277

           **KOHN, SWIFT & GRAF, P.C.**
           Steven M. Steingard, Esq.
           Stephen H. Schwartz, Esq.
           Neil L. Glazer, Esq.
           1600 Market Street, Suite 2500
           Philadelphia, PA 19103
           Telephone (215) 238-1700

           Attorneys for Plaintiffs