UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
MICHAL HONICKMAN for the ESTATE
OF HOWARD GOLDSTEIN, et al.,

                Plaintiffs,

      v.

BLOM BANK SAL,

              Defendant.
--------------------------------X

**MEMORANDUM & ORDER**

19-cv-00008(KAM)(SMG)

      Plaintiffs are victims, or the relatives of victims,
of attacks conducted by Hamas, a designated Foreign Terrorist
Organization ("FTO"),[1] between December 2001 and August 2003 in
Israel and the Palestinian Territories ("Plaintiffs").
Plaintiffs commenced this action pursuant to the Anti-Terrorism
Act ("ATA"), as amended by the Justice Against Sponsors of
Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), to recover damages
from BLOM Bank SAL ("BLOM," or "Defendant") for allegedly aiding
and abetting Hamas' commission of terrorist acts by providing
financial services to Hamas through three of BLOM's customers
who are alleged to be Hamas affiliates: the Sanabil Association
for Relief and Development ("Sanabil"), Subul Al-Khair, and the
Union of Good (collectively, BLOM's "Three Customers"). These

---

[1] A Foreign Terrorist Organization is an organization designated by the U.S.
Secretary of State pursuant to 8 U.S.C. § 1189(a) because it "engages in
terrorist activity" or "retains the capability and intent to engage in
terrorist activity or terrorism." 31 C.F.R. § 597.309; 8 U.S.C. § 1189(a).
Hamas was designated an FTO on October 8, 1997. *Designation of Foreign
Terrorist Organizations*, 62 Fed. Reg. 52,650 (Oct. 8, 1997).

organizations are alleged to have engaged in non-violent conduct in furtherance of Hamas' goals.

Defendant moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Plaintiffs have not plausibly alleged the elements of JASTA aiding-and-abetting liability as set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and adopted by the Second Circuit in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018). Specifically, Defendant argues that the complaint does not plausibly allege that BLOM (1) aided the persons or entity who carried out the attacks which caused their injuries, (2) was generally aware that, by providing financial services to the Three Customers, it was playing a role in Hamas' violent or life-endangering activities (the "general awareness" element), or (3) knowingly provided substantial assistance to Hamas (the "substantial assistance" element).

For the reasons set forth below, the Court finds that Plaintiffs' complaint does not plausibly allege the general awareness or the substantial assistance elements necessary to plead JASTA aiding-and-abetting liability. Defendant's motion to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) for failure to state a claim is GRANTED.

## Background[2]

Plaintiffs are individuals, or the relatives of individuals, who suffered injuries in one of twelve violent attacks carried out by Hamas in Israel and the Palestinian Territories between December 1, 2001 and August 19, 2003. (*See* ECF No. 1, Complaint ("Compl."), ¶ 1.) Plaintiffs sue Defendant, a major bank headquartered in Beirut, Lebanon (*id.* ¶ 504-05), for allegedly aiding-and-abetting Hamas' commission of terrorist attacks, like those which caused Plaintiffs' injuries.

Much of Plaintiffs' complaint is dedicated to describing Hamas' use of a civil infrastructure, which Plaintiffs call its "*da'wa*," to compete with other organizations for support in the areas in which it operates. (*See* Compl. ¶ 511, n.6.) It appears that the complaint's focus on Hamas' *da'wa* is predicated on Plaintiffs' theory of liability, that BLOM is liable because it provided financial services to its Three Customers, all of which are alleged to be "*da'wa* institutions in Lebanon tasked by Hamas to extend [its] reach into [local] Palestinian refugee camps" through the provision of charitable services and financial support to the local populations. (*Id.* ¶¶ 526, 610-11, 626.)

---

[2] The facts in this section are derived from Plaintiffs' complaint and are accepted as true for purposes of this Memorandum and Order.

## I.    The Three Customers

Because BLOM's alleged liability turns principally on its *knowing* conduct, and because its alleged provision of support to Hamas is indirect, the court reviews in detail Plaintiffs' allegations regarding the relationship between each of the three BLOM account holders with Hamas, Hamas' activities, and BLOM's alleged knowledge or awareness of the relevant facts.

### A. Sanabil

"Hamas established [the] Sanabil Association for Relief and Development" in 1994. (*Id.* ¶ 574.)  Sanabil served as "Hamas' *da'wa* headquarters in Lebanon until late 2003." (*Id.* ¶ 588.)  "Between 1998 and 2001, [Sanabil] received millions of dollars in support from Hamas' fundraising network" and "channeled those funds to the Palestinian refugee camps in Lebanon to build Hamas' support within that community." (*Id.*)

Plaintiffs' allege that Sanabil is, in sum and substance, an alter ego of Hamas and, thus, BLOM is liable.  As noted above, because knowledge is an integral component of a claim for civil aiding-and-abetting liability, the court considers which, if any, of Plaintiffs' allegations support the position that BLOM knew of Sanabil's alleged relationship with Hamas or Sanabil's alleged involvement in Hamas' violent acts at the time BLOM provided financial services to Sanabil.

## 1. Sanabil's Connection to Hamas

Plaintiffs do not allege that BLOM knew or was aware of a relationship between Sanabil and Hamas. Instead, Plaintiffs cite to several public statements and developments, or facts alleged to be within the public knowledge, from which Plaintiffs assert it could be plausibly inferred that BLOM was aware of a nexus between Sanabil and Hamas. These include:

- The August 22, 2003 designation of Sanabil as a Specially Designated Global Terrorist ("SDGT")[3] by the U.S. Treasury Department and accompanying press release, which stated that Sanabil "receives large quantities of funds raised by major Hamas-affiliated charities . . . and, in turn, provides funding to Hamas" (*id.* ¶ 590);

- An August 23, 2003 report published by a Lebanese newspaper, *Al-Saffir*, stating that in August 2001, following an order given by an unspecified Hamas leader, Sanabil opened offices in Palestinian refugee camps in Lebanon to "increase its activity" (*id.* ¶ 589);

- Undated "reports" that in 2003, following a ruling from the Lebanese judiciary, the Sanabil organization in the town of Sidon closed, which closure was attributed to Sanabil's links to Hamas (*id.* ¶ 609), with the only example of such a report being an August 27, 2004 article published by a Lebanese newspaper, *The Daily Star* (*id.* ¶ 610).

Plaintiffs do not allege that BLOM knew of the aforementioned facts. Moreover, none of the public statements cited in the complaint was published until after the last attack.

---

[3] The U.S. Treasury Department's Office of Foreign Assets Control's "SDGT designation is distinct from the State Department's FTO designation." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014). The Specially Designated Global Terrorist designation covers, *inter alia*, foreign persons who "pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." 31 C.F.R. §§ 594.310, 594.201(a).

Plaintiffs also allege that BLOM's knowledge of a nexus between Sanabil and Hamas could be inferred from the fact that Sanabil received payments from organizations later revealed to be affiliated with Hamas. The following provides a brief overview of the payments Sanabil received from organizations with alleged affiliations with Hamas:

- Holy Land Foundation ("HLF"). HLF was a U.S.-based charitable organization founded in October 1993. (*Id.* ¶ 555, 560.) BLOM processed roughly $1 million in payments in 2000 and $350,000 in 2001 from HLF to Sanabil through BLOM's New York correspondent accounts. (*Id.* ¶¶ 596-99.) The date of the last payment was September 7, 2001. (*Id.* ¶ 599.) The U.S. Treasury Department designated HLF as an SDGT on December 4, 2001. (*Id.* ¶ 567.) BLOM is not alleged to have processed any transactions from HLF to Sanabil following HLF's designation as an SDGT.

- KindHearts. Kindhearts was a U.S.-based charitable organization founded in January 2002. (*Id.* ¶ 615.) Sanabil received $250,000 from KindHearts between July 2002 and July 2003 (*id.* ¶ 603.) The U.S. Treasury Department first took action against Kindhearts on February 19, 2006, when it froze the organization's accounts (*id.* ¶ 619), well after the last of the attacks at issue in this action on August 19, 2003 (*id.* ¶ 76).[4]

- Al-Aqsa Foundation ("Al-Aqsa"). Al-Aqsa was a Germany-based charitable organization founded in July 1991. (*Id.* ¶ 549.) Sanabil received at least $50,000 from Al-Aqsa between April and May 2003. (*Id.* ¶ 604.) The U.S. Treasury Department designated Al-Aqsa an SDGT on May 29, 2003 due to its connection with Hamas. (*Id.* ¶ 553-54.) BLOM processed one transfer from Al-Aqsa to Sanabil the day after its designation, but Plaintiffs do not allege any

---

[4] Defendant notes that "the United States is not alleged to have ever designated KindHearts — a U.S. organization — as an SDGT." (ECF No. 36-1, Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("Def. Br.") at 10.)

later transfers from Al-Aqsa to Sanabil's account at BLOM.
(*Id.* ¶ 605.)[5]

With one exception, BLOM did not process any payments from the

aforementioned organizations to Sanabil after the U.S. Treasury

Department took action against them, including by designating

two of them as SDGTs.

### 2. Sanabil's Connection to Hamas' Violent Acts

Plaintiffs do not allege that BLOM knew of a nexus

between Sanabil and Hamas' violent acts, or that Sanabil itself

played a role in Hamas' violent activities. Rather, the

allegations in the complaint suggest that Sanabil engaged in

charitable acts rather than any acts related to terrorism:

- An August 27, 2004 article published by *The Daily Star* stated that Sanabil "had sponsored 1,200 Palestinian families and spent around $800,000 on orphans and $55,000 on needy patients" (*id.* ¶ 610);

- "Records seized from HLF show that Sanabil regularly distributed small sums in cash from its accounts to hundreds (if not thousands) of individual dependents in the Palestinian refugee camps under the categories of 'Orphan Sponsorships,' 'Student Sponsorships,' 'Needy Sponsorships' and 'Family Sponsorships'" (*id.* ¶ 611); and

- The only invoice attached to Plaintiffs' complaint which indicates a "purpose" for a payment Sanabil received from

---

[5] Plaintiffs allege that Israel outlawed Al-Aqsa in May 1997 and declared it a
terrorist organization in January 1998 (*id.* ¶ 550), and that Germany closed
Al-Aqsa's offices in July 2002 due to its support of violence as a means to
achieve ends (but not specifically due to its links to Hamas) (*id.* ¶ 551-52).
Plaintiffs do not allege that BLOM maintains an office in Germany or Israel
or knew or would otherwise have any reason to know of these developments.
(*Accord* Def. Br. at 7 (stating that BLOM "is actively present in 12
countries, serving the niche market of Lebanese and Arab expatriates and
business people in Europe, but has no operations in the United States or in
Israel, where all of the alleged [a]ttacks occurred").)

> the aforementioned organizations states that it was for
> "help concerning orphan children" (*id.* Ex. D).

The only portion of the complaint connecting Sanabil's funds to Hamas' activities is Plaintiffs' allegation that Sanabil operated on Hamas' behalf "in a manner of an old-style political machine, buying loyalty in periodic stipends of $40-50 per quarter." (*Id.* ¶ 612.) But Sanabil is not alleged to have engaged in any violent acts, either on its own or in conjunction with Hamas.

### B. Subul Al-Khair

Plaintiffs allege fewer details regarding Subul Al-Khair. Subul Al-Khair "is a small Hamas institution founded in Beirut, Lebanon in 1998." (*Id.* ¶ 621.) Defendant maintained an account for Subul Al-Khair at its Rawsheh branch in Beirut and "deposited [over $500,000] in transfers sent by HLF to Subul Al-Khair" between 1999 and 2001. (*Id.* ¶¶ 623, 625.) Plaintiffs do not specify the date of the last HLF payment to Subul Al-Khair in 2001, but there is no allegation that it occurred after the December 4, 2001 designation of HLF as an SDGT by the U.S. Treasury Department (*id.* ¶ 567).

### 1. Subul Al-Khair's Connection to Hamas

Plaintiffs do not allege that BLOM knew of Subul Al-Khair's nexus to Hamas, nor do Plaintiffs cite any public statements regarding Subul Al-Khair's relationship with Hamas.

Plaintiffs' only allegation suggesting that BLOM was aware of a nexus between Subul Al-Khair and Hamas is that "Subul al-Khair was identified as an unindicted co-conspirator in HLF's criminal trial" (*id.* ¶ 622), but this trial did not begin until sometime in 2004 (*id.* ¶ 567), well after the transactions BLOM processed on behalf of Subul Al-Khair.

### 2. Subul Al-Khair's Connection to Hamas' Violent Acts

Plaintiffs' similarly do not allege that BLOM was aware of a connection between Subul Al-Khair and Hamas' violent activities, or that any such nexus existed. The complaint states that "Subul al-Khair functioned much like Sanabil, but was more focused on Hamas supporters in the Beirut area." (*Id.* ¶ 624.) Subul Al-Khair "regularly distributed small sums in cash from its accounts to individual[s] under the categories of 'Orphan Sponsorships' and 'Student Sponsorships.'" (*Id.* ¶ 626.) And, like Sanabil, Subul Al-Khair "paid small amounts individually in a manner of an old-style political machine, buying loyalty in periodic stipends of $30-40 per quarter." (*Id.* ¶ 627.) Subul Al-Khair, however, is not alleged to have engaged in violent acts on its own or in conjunction with Hamas.

### C. Union of Good

The Union of Good was established in 2000 "as the umbrella organization for Hamas' global fundraising activity."

(*Id.* ¶ 629.)  The Union of Good maintained an account with BLOM
in Beirut.  (*Id.* ¶ 640.)  Plaintiffs do not specify which, if
any, transactions BLOM processed on behalf of the Union of Good.
Nor do Plaintiffs provide dates for when BLOM maintained the
stated account on behalf of the Union of Good.

### 1. Union of Good's Connection to Hamas

Plaintiffs do not allege that BLOM knew of a nexus
between the Union of Good and Hamas, but again rely on public
statements to support this inference, including:

- That Sheikh Yusuf al-Qaradawi – the individual who chaired
  the 101-day fundraising drive for emergency aid at the
  outset of the Second Intifada, which ultimately developed
  into the Union of Good – made statements approving of
  terrorism, only one of which (made on April 14, 2002) also
  referenced Hamas, but not in a manner linking it to the
  Union of Good (*id.* ¶¶ 631-32, 637);

- That "Hamas often relies on al-Qaradawi's legal rulings in
  matters of current import and often turns to him to obtain
  legal rulings" (*id.* ¶ 638);

- That "Hamas leaders have . . . served openly in the Union
  of Good's executive leadership" (*id.* ¶ 639); and

- The November 12, 2008 designation of the Union of Good as
  an SDGT by the U.S. Treasury Department for its connections
  to Hamas (*id.* ¶ 635).

Plaintiffs do not allege that BLOM was aware of these facts.[6]

---

[6] Plaintiffs cite Israel's February 25, 2002 designation of the Union of Good
due to its reported affiliation with Hamas.  (*Id.* ¶ 634.)  Yet, Plaintiffs do
not allege that BLOM maintains any branch in Israel or would have any other
reason to know of the Israeli designation of the Union of Good.

> 2. *Union of Good's Connection to Hamas' Violent
>    Acts*

Plaintiffs do not allege that BLOM knew of a nexus
between the Union of Good and Hamas' violent acts, nor do they
allege that Union of Good engaged in any violent activities
alone or in conjunction with Hamas.

## II.  **The Instant Action**

On January 1, 2019, Plaintiffs filed a complaint
against BLOM for allegedly aiding and abetting Hamas' attacks
under the civil liability provisions of the ATA, as amended by
JASTA, 18 U.S.C. § 2333(d).  As explained above, Plaintiffs do
not argue that BLOM is liable because it directly provided Hamas
with funding or weaponry.  Rather, Plaintiffs argue that BLOM's
Three Customers are, in sum and substance, alter egos of Hamas
and, therefore, that BLOM's provision of financial services to
*its Three Customers* amounted to aiding and abetting Hamas'
terrorist acts in violation of 18 U.S.C. § 2333(d).

On May 3, 2019, BLOM sought leave to move to dismiss
the complaint for failure to state a claim upon which relief may
be granted.  (ECF No. 20, Letter Motion for Pre-Motion
Conference.)  At a pre-motion conference addressing BLOM's
proposed motion, the Court offered Plaintiffs an opportunity to
amend their complaint to add additional allegations in response
to BLOM's arguments.  (ECF Dkt. Entry May 15, 2019.)  Plaintiffs

declined the Court's offer and represented to the Court that they would not be seeking to amend their Complaint. (*Id.*) After the parties submitted their memoranda, on November 25, 2019, the Court heard oral argument on Defendant's motion to dismiss. (ECF Dkt. Entry, Nov. 25, 2019. For the reasons set forth below, BLOM's motion to dismiss is granted.

## Standard of Review

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, the plaintiff must plead facts that allow the court to "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations pled must "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In reviewing a complaint under Rule 12(b)(6), the Court considers whether the plaintiff's well-pleaded factual allegations, assumed to be true, and drawing all reasonable inferences in the non-movant's favor, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. But the Court

is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Thus, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is not sufficient. *Iqbal*, 556 U.S. at 678. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual development.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).

### Discussion

Plaintiffs' claims against BLOM arise under the ATA. "The ATA establishes a cause of action for U.S. nationals who are the victims of international terrorism." *Kaplan v. Lebanese Canadian Bank*, 405 F. Supp. 3d 525, 531 (S.D.N.Y. 2019). "For purposes of and according to the ATA, 'international terrorism' includes 'activities that (A) involve violent acts or acts dangerous to human life that . . . would be a criminal violation if committed within the jurisdiction of the United States or of any State' and that '(B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping.'" *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) (quoting 18 U.S.C. § 2331(1)(A)-(B)).

"In its original form, the ATA afforded relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors." *Id.* (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018)). In 2016, however, Congress amended the ATA through JASTA to provide for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed[,] such an act of international terrorism." 18 U.S.C § 2333(d)(2). This aiding-and-abetting provision forms the basis of BLOM's alleged liability.

Congress instructed courts to assess aiding-and-abetting liability under JASTA pursuant to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Linde*, 882 F.3d at 329. *Halberstam* prescribes that civil aiding and abetting is comprised of three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." *Id.* (citing *Halberstam*, 705 F.2d at 487).

## I. The *Halberstam* Framework

BLOM argues that Plaintiffs have not satisfied *Halberstam* because they do not plausibly allege (1) that BLOM

14

aided the persons or entity who carried out the attacks, (2)
that BLOM was "generally aware" that by providing financial
services to the Three Customers, it was thereby playing a role
in Hamas' violent or life-endangering activities, or (3) that
BLOM knowingly provided substantial assistance to Hamas.[7]  The
Court agrees that Plaintiffs have failed plausibly to allege the
general awareness and substantial assistance prongs.

### A. "Aiding Party Who Causes Injury" Element

The first element Plaintiffs must plausibly allege is
that "the party . . . whom [BLOM] aid[ed] . . . perform[ed] a
wrongful act that cause[d] an injury." *Id.*  BLOM argues that
JASTA applies only to the provision of direct support to
terrorist organizations. *See, e.g.*, *Crosby v. Twitter, Inc.*,
921 F.3d 617, 626-27 (6th Cir. 2019).  In BLOM's view, because
the Three Customers are distinct from Hamas, Plaintiffs cannot
satisfy this element of *Halberstam* without establishing that
BLOM either provided funding directly to Hamas or to the
individuals who carried out the attacks.

The Second Circuit recently considered whether aiding-
and-abetting liability under JASTA is limited to the direct
provision of support to a terrorist organization. *Siegel*, 933

---

[7] Defendant alternatively moves to dismiss certain individual plaintiffs'
claims. (Def. Br. at 25-27.)  Because the Court grants Defendant's motion to
dismiss Plaintiffs' complaint in its entirety, it need not address whether
these plaintiffs' claims should also be dismissed on other grounds.

F.3d at 223.  The panel stated in a footnote that "[JASTA] does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was 'to provide civil litigants with the broadest possible basis' to seek relief against those who 'have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'"  *Id.* at 223 n.5 (emphasis in original).  This *dicta* suggests a healthy skepticism on the Second Circuit's part as to whether JASTA liability is as limited as BLOM asserts.

The Court need not answer this question, however, because Plaintiffs' complaint fails on other grounds.  As in *Siegel*, Plaintiffs have "failed to allege adequately two of the three *Halberstam* elements of civil aiding-and-abetting: (1) that [BLOM] was 'generally aware' of its role as part of an 'overall illegal or tortious activity at the time that [it] provide[d] the assistance,' and (2) that [BLOM] 'knowingly and substantially assist[ed] the principal violation."  *Id.* at 224 (quoting *Halberstam*, 705 F.2d at 477).  The Court thus leaves to a later date the resolution of the question regarding the necessity of direct support.

## B. "General Awareness" Element

The second element Plaintiffs must plausibly allege is that "[BLOM] was 'aware that, by assisting the principal, it [was] itself assuming a role in terrorist activities.'" *Id.* (citing *Linde*, 882 F.3d at 329). Plaintiffs must allege that BLOM must have known it was assuming a role in Hamas' terrorist activities "at the time that [it] provide[d] the assistance." *Linde*, 883 F.3d at 329 (citing *Halberstam*, 705 F.2d at 487).

The Second Circuit has clarified that the mere provision of routine banking services to an FTO does not render a bank liable for civil aiding and abetting. *Linde*, 882 F.3d at 329. "Evidence that [a bank] knowingly provided banking services to [an FTO], without more, is insufficient to satisfy JASTA's scienter requirement." *Weiss v. National Westminster Bank PLC*, 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019). This is because "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*." *Linde*, 882 F.3d at 329 (emphasis in original).

Rather, the bank must be "'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Id.* (citing *Halberstam*, 705 F.2d at 477). "Such awareness may not require proof of . . . specific intent" or knowledge "of the specific attacks at issue." *Id.* But "it does

17

require that 'the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities.'" *Siegel*, 933 F.3d at 224 (quoting *Linde*, 882 F.3d at 329 (alterations in original)).  This is a higher *mens rea* than that sufficient to establish material support in violation of the ATA, "which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Linde*, 882 F.3d at 329-30.

In light of this precedent, it is not enough for Plaintiffs to "plausibl[y] allege that BLOM was 'generally aware of [its] role' in 'terrorist activities,' from which terrorist *attacks* were a natural and foreseeable consequence." (ECF No. 37, Pls.' Opp. to Mot. to Dismiss ("Pls. Opp."), at 11.) Adopting this reading would, in effect, replace the scienter for aiding-and-abetting liability with the lower scienter required for material support, in direct contravention of *Linde*'s holding that the bank must be aware that it is assuming a role in the organization's "violent or life-endangering activities." *See Siegel*, 933 F.3d at 224 (citing *Linde*, 882 F.3d at 329). Attempts to conflate these scienter requirements have been rejected by courts within this circuit. *See, e.g.*, *Weiss*, 381 F. Supp. 3d at 238-39 ("Plaintiffs again rely on evidence that

tends to support a finding that Defendant had the requisite scienter required for providing material support to a terrorist organization under § 2339B to support their claim that Defendant had the requisite scienter for aiding and abetting liability under JASTA. *See*, Opp. at 24-25 (discussing Defendant's 'massive, illicit funds transfers' for Interpal and the Union of Good). However, as discussed in detail above, Plaintiffs allege no facts establishing a jury question as to whether Defendant generally was aware that it played a role in any of Hamas's, or even Interpal's, or the Union of Good's violent or life-endangering activities. Evidence that Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."); *Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019) (same); *Siegel*, 2018 WL 3611967, at *4 (finding claim insufficient where defendant bank allegedly aided and abetted another bank, which was known to support terrorism).[8]

_____

[8] Plaintiffs quote a passage from *Halberstam* stating that the district court's conclusions that Hamilton "*knew about* and acted to support *Welch's illicit enterprise*," if not the murder, establish that she "had a general awareness of her *role in a continuing criminal enterprise*." (Pls. Br. at 10 (quoting *Halberstam*, 705 F.2d at 488 (emphasis added)).) Plaintiffs argue that this standard simply requires Plaintiffs to show that BLOM knew that it was playing a role, in a sense, in Hamas' terrorist *enterprise*, by providing funds to organizations which supported Hamas. Again, the standard Plaintiffs seek to impose is simply that of knowingly providing material support to a terrorist organization, which differs from the scienter required to support aiding-and-abetting liability for supporting terrorist acts.

With this guidance in mind, the Court considers whether Plaintiffs have plausibly alleged that, by providing financial services to the Three Customers, BLOM generally assumed a role in Hamas' violent or life-endangering activities. The answer is no. As in *Siegel*, Plaintiffs have "failed to [plausibly] allege [1] that [BLOM] was aware that by providing banking services to [the Three Customers], it was supporting [Hamas], [2] much less assuming a role in [Hamas'] violent activities." *See Siegel*, 933 F.3d at 224.

*First*, Plaintiffs' complaint does not plausibly allege that BLOM was generally aware of any connection between the Three Customers and Hamas. In their complaint, Plaintiffs do not allege any acts or statements by BLOM or BLOM's employees which suggest any awareness on its part of a connection between any of the Three Customers and Hamas. Instead, Plaintiffs cite to press articles, government actions, and allegedly "public knowledge" discussing a connection between the Three Customers and Hamas as evidence from which a jury could infer that BLOM *might* have known of such a nexus. Yet, Plaintiffs fail plausibly to allege that BLOM or any of its employees actually knew or should have known of any of the cited sources, or that BLOM would otherwise have a reason to review or consider those sources in the course of its operations. This is particularly notable given that all of the sources cited regarding the Three

Customers and their connection to Hamas are either undated or were dated after the last of the attacks. The sole exception – a single payment processed *from* Al-Aqsa, a non-customer, to Sanabil one day after Al-Aqsa's designation by the U.S. Treasury Department – is not sufficient to render Plaintiffs' allegation plausible, particularly given that Sanabil itself was not designated until several months later. Furthermore, during the period in question, none of the Three Customers was itself designated during the time BLOM processed transactions on its behalf, *see, e.g.*, *O'Sullivan v. Deutsche Bank AG et al.*, No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) (finding that designation of entities years after defendants transacted with them "undermin[ed] any inference that [d]efendants had reason to know about [their] connections with FTOs"). Plaintiffs' allegations therefore fail to raise above the speculative level the specter that BLOM was aware of a connection between the Three Customers and Hamas at the time it provided financial services to the Three Customers.[9]

---

[9] Plaintiffs also rely substantially on alleged transfers from HLF, KindHearts, and Al-Aqsa to the Three Customers to support the general awareness element. But none of these organizations are alleged to be customers of BLOM, nor was there any evidence, as in *Strauss and Weiss*, that any of these transfers "were used to perpetrate any of the [violent acts]" allegedly carried out by Hamas. Without further factual enhancement, Plaintiffs' citations to these transactions does nothing more than speculate as to whether BLOM might have known of this nexus.

*Second*, even if Plaintiffs' allegations plausibly alleged that BLOM knew the Three Customers were related to Hamas, "[e]vidence that [BLOM] knowingly provided banking services to [Hamas], without more, is insufficient to satisfy JASTA's scienter requirement." *Strauss*, 379 F. Supp. 3d at 164; *accord Linde*, 882 F.3d at 329; *Weiss*, 381 F. Supp. at 239. Rather, Plaintiffs must plausibly allege that BLOM intended to further Hamas' *violent or life-endangering activities* or was generally aware that it was playing a role in those activities. *Linde*, 882 F.3d at 329-30; *O'Sullivan*, 2019 WL 1409446, at *10 (noting that to satisfy the second *Halberstam* element in this context, plaintiffs must allege that "in providing financial services, [the bank] w[as] 'generally aware' [it] w[as] paying a 'role' in an FTO's violent or life-endangering activities").

Plaintiffs have not plausibly alleged that BLOM knew that by providing financial services to the Three Customers, it was playing a role in Hamas' violent activities. The complaint does not allege that the Three Customers engaged in any "violent activities." To the contrary, the complaint sets forth a number of apparently charitable purposes towards which the Three Customers put their funds, including giving money to orphans, students, and the needy. *See, e.g.*, *Weiss*, 381 F. Supp. 3d at 232 (finding it relevant that plaintiffs conceded that recipients of funds actually engaged in charitable activities);

*Strauss*, 379 F. Supp. 3d at 157 (same).  This is evidenced by an invoice annexed to the complaint, which notes that the transaction was to be used for "help concerning orphan children."  (Compl. Ex. D.)  Even accepting as true that the Three Customers did so to procure political support for Hamas in the refugee camps, this does not cure the absence of any plausible allegation that BLOM was aware it was assuming a role in Hamas' violent or life-endangering activities.  *See, e.g.*, *O'Sullivan*, 2019 WL 1409446, at *10; *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ("Accepting those statements as true, however, the [complaint] does not demonstrate that defendants knew that the financial services they provided to ARB would in turn be given to AQI and al-Qaeda to carry out terrorist attacks . . . .").

Plaintiffs attempt to analogize their case to those in which courts have allowed aiding-and-abetting claims against banks to proceed.  They cite *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019), in which the court allowed the plaintiffs to proceed with an aiding-and-abetting claim against Arab Bank where the plaintiffs alleged that Arab Bank intentionally "administered a terrorist insurance scheme" for Hamas, quoted public notices directing individuals to proceed to Arab Bank to receive payouts pursuant to the alleged scheme, and cited causes of death identified on lists that the bank received

as part of the alleged scheme.  Plaintiffs also cite *Lelchook v.*
*Islamic Republic of Iran*, 393 F. Supp. 3d 261 (E.D.N.Y. 2019),
in which the court entered default judgment against an
unrepresented defendant where the court found that the
allegations in the unanswered complaint plausibly supported the
allegation that the defendant bank knowingly and substantially
supported Hizbollah's operations.

A more appropriate comparison is Judge Daniels' recent
decision in *Kaplan v. Lebanese Canadian Bank, SAL*.  In *Kaplan*,
plaintiffs sued Lebanese Canadian Bank ("LCB") for aiding and
abetting Hizbollah by maintaining accounts for two Hizbollah
leaders and three "subordinate entities."  405 F. Supp. 3d at
529.  The subordinate entities allegedly functioned as
Hizbollah's principal financial institutions or provided direct
support to Hizbollah terrorists wounded in action.[10]  *Id.*  The
plaintiffs alleged that Hizbollah "conducted wire transfers
through the LCB [a]ccounts 'in order to transfer and receive
funds necessary for planning, preparing and carrying out
Hizbollah's terrorist activity,' including the rocket attacks

---

[10] "[T]hese 'subordinate entities' include the Shahid (Martyrs) Foundation
('Shahid'), which allegedly provides 'financial and other material support to
Hizbollah terrorists wounded in action, and to the families of Hizbollah
terrorists killed in action'; Bayt al-Mal, which allegedly functions as
Hizbollah's 'main financial body'; and the Yousser Company for Finance and
Investment . . . , which, together with Bayt al-Mal, allegedly functions as
Hizbollah's 'unofficial treasury.'"  *Kaplan*, 405 F. Supp. 3d, at 529.

that injured Plaintiffs." *Id.* To satisfy the awareness
element, the plaintiffs alleged that:

> [LCB] knew or should have known that providing such banking
> services would result in Plaintiffs' injuries. [T]hey
> allege[d] that [LCB] knew that Shahid, Bayt-al-Mal, and
> Yousser were 'integral constituent parts of Hizbollah,'
> that the LCB Accounts and funds therein were owned and
> controlled by Hizbollah, and that the wire transfers were
> conducted by and at the direction of Hizbollah. Plaintiffs
> allege that [LCB] had such knowledge because Hizbollah's
> affiliation with Shahid, Bayt-al-Mal, and Yousser was
> 'notorious public knowledge,' as evidenced by various news
> articles, reports, and Hizbollah's own media sources.
> According to Plaintiffs, if [LCB] did not have such actual
> knowledge, then [LCB] should have known because it had a
> duty to perform due diligence on its customers, monitor and
> report suspicious or illegal banking activities, and not
> provide banking services to [FTOs].

*Id.* The plaintiffs further alleged that "[LCB] provided the
wire transfer and other banking services to Hizbollah 'as a
matter of official LCB policy and practice' in order, among
other things, 'to assist and advance Hizbollah's terrorist
activities.'" *Id.*

Judge Daniels found the plaintiffs' allegations
insufficient to state a claim of aiding-and-abetting liability
under the *Halberstam* framework. The plaintiffs "d[id] not offer
any non-conclusory allegations that Defendant was aware that, by
providing financial services to the subordinate entities, it was
playing a role in violent or life-threatening acts intended to
intimate or coerce civilians or affect a government." *Id.* at
535. None of the entities were designated by the United States

prior to the rocket attacks at issue as having an affiliation with Hizbollah. *Id.* Moreover, although the plaintiffs argued that the entities' connections to Hizbollah "was openly, publicly and repeatedly acknowledged and publicized by Hizbollah [through its own sources]" and "in various English-language publications," the plaintiffs "nowhere allege[d] . . . that [LCB] read or was aware of such sources." *Id.* The same analysis applies even more strongly here, given the relatively greater strength of the allegations in *Kaplan*.[11]

## C. "Substantial Assistance" Element

The third element Plaintiffs must plausibly allege is that BLOM "'knowingly and substantially assist[ed] the principal violation.'" *Id.* at 535-36 (quoting *Halberstam*, 705 F.2d at 477 (alterations in original)). To determine whether Plaintiffs adequately pleaded this element, the Court looks to "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's

---

[11] The only fact in this action which presents an arguably stronger argument than in *Kaplan* is that BLOM processed a transaction *from* Al-Aqsa, a non-client, *to* Sanabil, a client, after its designation. But this transaction was not processed for a client, occurred just one day after Al-Aqsa's designation, was received from a Swedish bank through New York, and specified assistance to orphans as its purpose. It is nothing more than speculation that this transaction would trigger some awareness on BLOM's part that there was a nexus between Sanabil and Hamas, let alone Hamas' violent activities.

assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705
F.2d at 483–84).  The complaint fails to establish that BLOM's
provision of financial services to the Three Customers amounted
to providing "substantial assistance" to Hamas.

As a threshold matter, *Halberstam*'s substantial
assistance element requires that BLOM's assistance be *knowing*.
For the same reasons set forth above, Plaintiffs' complaint
fails plausibly to allege that any assistance BLOM provided –
even if substantial – would have been knowing, as the
allegations support nothing more than the speculative
possibility that BLOM *might* have known about a nexus between the
Three Customers and Hamas (though, as specified above, no
allegations whatsoever link the Three Customers to Hamas'
violent activities).  The Court will address scienter in the
context of the substantial assistance element in more detail in
discussing the six considerations outlined in *Linde* and
*Halberstam*.

Nature of the Act Encouraged.  Plaintiffs' harm arises
from violent acts conducted by Hamas, but Plaintiffs have not
plausibly alleged that BLOM encouraged the attacks which injured
Plaintiffs or knowingly provided any funds to Hamas for its
violent activities.  *See, e.g.*, *Siegel*, 933 F.3d at 225 ("The
plaintiffs here have not plausibly alleged that HSBC encouraged
the heinous November 9 Attacks or provided any funds to AQI.");

*Kaplan*, 405 F. Supp. 3d at 536 ("Plaintiffs do not advance any factual, non-conclusory allegations that Defendant knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks."). Assuming *arguendo* that BLOM knew anything of the Three Customers' efforts to support Hamas, it would be that they engaged in the purchase of political support, but none of the factual allegations in Plaintiffs' complaint suggest that BLOM knowingly encouraged Hamas' violent activities, such as those which caused Plaintiffs' injuries.

Amount and Kind of Assistance Given by Defendant. Plaintiffs allege that BLOM's provision of financial services to the Three Customers resulted in "millions of dollars" flowing to Hamas which were "integral" to Hamas' terrorist operations. But Plaintiffs make no non-conclusory assertions that any of the funds processed by the Three Customers actually went to Hamas, or that BLOM, at the time it provided banking services to the Three Customers, was aware or intended that Hamas would receive the corresponding funds. *See, e.g.*, *Siegel*, 933 F.3d at 225 ("[P]laintiffs did allege that HSBC provided hundreds of millions of dollars to ARB, but they did not advance any non-conclusory allegation that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds."); *Kaplan*, 405 F. Supp. 3d at 536 ("[A]lthough Plaintiffs assert that Defendant processed millions of dollars' worth of wire

transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds."). Again, even assuming the Three Customers did work to drum up political support for Hamas, there are no non-conclusory allegations that BLOM's assistance to the Three Customers went towards Hamas' violent activities.

Defendant's Presence or Absence at the Time of the Acts. BLOM was not physically present during the attacks. Even if the term "presence" could be broadly interpreted, *Siegel*, 933 F.3d at 225 ("[A]s the plaintiffs themselves allege, HSBC was not 'present' at the time of the November 9 Attacks. Indeed, HSBC had *ceased transacting any business* with ARB ten months prior." (emphasis added)), BLOM was not "present" during the time of the attacks, other than providing banking services to Sanabil and Subul Al-Khair during the relevant period. (Plaintiffs make no allegations as to when the Union of Good maintained an account at BLOM.)

Defendant's Relation to the Principal. Plaintiffs make no non-conclusory allegations that BLOM had any relationship with Hamas. *See, e.g.*, *id.* ("On the fourth factor — defendant's relation to the principal — the plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with AQI.").

Defendant's State of Mind.  Plaintiffs make no non-conclusory allegations that BLOM knowingly assumed a role in Hamas' terrorist activities or otherwise knowingly or intentionally supported Hamas.  *See, e.g.*, *id.* ("[O]n the fifth factor — defendant's state of mind — the plaintiffs do not plausibly allege that HSBC knowingly assumed a role in AQI's terrorist activities or otherwise knowingly or intentionally supported AQI.").  Plaintiffs' citation to allegedly public knowledge, without any plausible allegations tying the cited public knowledge to BLOM, is not sufficient to show that BLOM had a culpable state of mind.

Period of Defendant's Assistance.  Plaintiffs do not allege the full duration of BLOM's relationship(s) with the Three Customers.  Plaintiffs allege that BLOM provided Sanabil and Subul Al-Khair with financial services for the duration of the relevant period but make no plausible allegation that any of the funds provided to the Three Customers during this period went to support Hamas' violent activities.  *See, e.g.*, *id.* ("[P]laintiffs do not allege — even conclusorily — that most, or even many, of HSBC's services to ARB assisted terrorism.").

Plaintiffs again rely on cases addressing liability for the provision of material support to terrorist groups in arguing that their allegations are sufficient to withstand a motion to dismiss.  They cite, for example, *Boim v. Holy Land*

*Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008)
(finding that the provision of support to a terrorist
organization, even if "earmark[ed] . . . for the organization's
non-terrorist activities[,] does not get [a defendant] off the
liability hook" because such activities "reinforce [an FTO's]
terrorist activities"), and *Gill v. Arab Bank, PLC*, 893 F. Supp.
2d 474, 507 (E.D.N.Y. 2012) ("A contribution, if not used
directly, arguably would be used indirectly by substituting it
for money in Hamas' treasury; money transferred by Hamas'
political wing in place of the donation could be used to buy
bullets."). As addressed above, however, Plaintiffs' reliance
on this line of cases is misplaced. Liability for providing
material support to an FTO turns on a different, less onerous
scienter requirement than aiding and abetting a terrorist act.

 *Kaplan* again provides a more appropriate point of
reference. There, as here, the plaintiffs "d[id] not advance
any factual, non-conclusory allegations that [LCB] knowingly and
intentionally supported Hizbollah in perpetrating [its violent
activities, i.e., rocket attacks]." *Kaplan*, 405 F. Supp. 3d at
536. "[A]lthough Plaintiffs assert[ed] that [LCB] processed
millions of dollars' worth of wire transfers through the LCB
Accounts, [they] d[id] not plausibly allege that Hizbollah
received any of those funds or that [LCB] knew or intended that
Hizbollah would receive the funds." *Id.* "Nor d[id] Plaintiffs

sufficiently allege that [LCB] knew, prior to the attacks, about any affiliations between Hizbollah and the [subordinate entities] under whose names the LCB Accounts were held."[12] *Id.* So too here.

## II. Leave to Amend

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, courts should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). Whether to grant leave is a matter "within the sound discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). In line with this authority, the Court typically grants plaintiffs an opportunity to amend their complaints following dismissal, to address any deficiencies raised by the Court's order. Plaintiffs here do not request leave to amend, and specifically declined the Court's offer to do so at the pre-motion conference. The Court addresses amendment of the complaint because BLOM asks that dismissal be with prejudice. (Def. Br. at 27.)

---

[12] Judge Daniels also rejected an argument, not made here, that LCB processed the payments pursuant to its longstanding policy of supporting Hizbollah. *Kaplan*, 405 F. Supp. 3d at 536. The plaintiffs' only evidence of this fact was the U.S. Treasury's February 2011 designation of LCB as a "primary money laundering concern" and limited allegations from a December 2011 complaint filed against LCB, which Judge Daniels found insufficient to support plaintiffs' allegations that LCB supported Hizbollah's agenda or that LCB provided funds to the subordinate entities to support this agenda. *Id.*

The Second Circuit has clarified that a district court may dismiss a complaint without providing for an amendment where, as here, the plaintiffs previously declined an opportunity to amend their complaint:

> The district court gave plaintiffs-appellants the opportunity to amend the Complaint after a pre-motion telephone conference where the defendants described their arguments in favor of dismissal. Plaintiffs-appellants declined to do so. Thereafter, plaintiffs-appellants did not move to amend the Complaint after the defendants filed their briefs in support of dismissal. Although plaintiffs-appellants informally requested leave to amend in their motion papers, they did not submit proposed amendments or otherwise indicate how they would correct any deficiencies in the Complaint. Under these circumstances, it was within the district court's discretion to dismiss the Complaint with prejudice.

*Rosner v. Star Gas Partners, L.P.*, 344 F. App'x 642, 645 (2d Cir. 2009) (summary order); *see also Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 97 (2d Cir. 2012) (summary order) (stating that "a district court does not abuse its discretion to deny a plaintiff's motion to alter or amend a judgment" where "the court expressly invited plaintiffs to amend the Complaint, but plaintiffs declined the court's invitation").

Courts in the Second Circuit routinely dismiss complaints without leave under similar circumstances. *See, e.g.*, *Herman v. Town of Cortlandt, Inc.*, No. 18-CV-2440 (CS), 2019 WL 2327565, at *7 (S.D.N.Y. May 30, 2019) (granting motion to dismiss without leave to amend because "Plaintiffs did not amend, despite having been given leave to do so after receiving

the benefit of a pre-motion letter from Defendants, as well as the Court's observations during a pre-motion conference"); *Berman v. Morgan Keegan & Co.*, No. 10-cv-5866(PKC), 2011 WL 2419886, at *3 (S.D.N.Y. June 3, 2011), *aff'd*, 455 F. App'x 92; *Williams v. Time Warner Inc.*, No. 09-cv-2962(RJS), 2010 WL 846970, at *7 (S.D.N.Y. Mar. 3, 2010), *aff'd*, 440 F. App'x 7 (2d Cir. 2011).

In light of Plaintiffs' rejection of the opportunity to amend their pleading at the pre-motion conference, and the fact that they have not identified any additional facts they could allege which would address the deficiencies in their complaint, the Court finds that it need not grant Plaintiffs leave to amend.  The complaint will therefore be dismissed with prejudice.

## Conclusion

For the reasons set forth above, the Court finds that Plaintiffs have failed to plausibly state a claim that Defendant aided and abetting Hamas's terrorist acts, such as those which caused their injuries, in violation of 18 U.S.C. § 2333(d). Plaintiffs' complaint fails plausibly to allege (1) that Defendant was generally aware that, by providing financial services to the Three Customers, it was thereby playing a "role" in Hamas' terrorist activities, and (2) that Defendant knowingly provided "substantial assistance" to Hamas by providing

financial services to the Three Customers.  In light of this
holding, the Court need not reach Defendant's alternative
argument that certain plaintiffs' claims require dismissal for
jurisdictional or other reasons.

Defendant's motion to dismiss Plaintiffs' complaint
with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure for failure to state a claim upon which relief
may be granted is therefore GRANTED.  The Clerk of Court is
respectfully directed to enter judgment in favor of Defendant
and to close this case.

**SO ORDERED.**

Dated:     January 14, 2020
          Brooklyn, New York

                                            /s/
                              Hon. Kiyo A. Matsumoto
                              United States District Judge